THE ELEXENA.

THE ALICE J. VENABLE.

THE SAMUEL T. WHITE.

HASTINGS v. THE ELEXENA.

GIBBONS v. THE ALICE J. VENABLE.

SAME v. THE SAMUEL T. WHITE.

(District Court, E. D. Virginia. November 30, 1892.)

1. CONSTITUTIONAL LAW—MARITIME LIENS — STATE OYSTER LAWS — CONFISCATION OF VESSEL BY STATE.

Code Va. § 2186, providing that a sale of a vessel forfeited by proceedings in the state court for violating the oyster laws of the state "shall vest in the purchaser a clear and absolute title," is null and inoperative, in so far as it would divest the maritime liens of innocent parties attaching before the arrest of the vessel; and such vessel may be subsequently seized in the hands of the purchaser, and subjected to such liens, by proceedings in the federal admiralty courts. Taylor v. Carryl, 20 How. 583, distinguished.

2. SAME—MARITIME LIENS—SUPPLIES AND MATERIALS.

On such a libel, claims for supplies, materials, and repairs furnished within six months before the seizure of the vessel by the state must be allowed, but materials furnished after such seizure must be disallowed, as not within the jurisdiction of the court.

3. SAME—SEAMEN'S WAGES.

Claims for wages by seamen who were on the vessel at the time of her seizure, and presumably participating in the violation of law for which she was seized, must be disallowed.

In Admiralty. Libels for materials, repairs, and seamen's wages.

Thomas S. Hodson, for libelants.
R. Taylor Scott, Atty. Gen., for the State of Virginia.
Harmanson & Heath and Robert L. Montague, Jr., for claimants.

HUGHES, District Judge. These vessels, arrested, condemned, and sold under forfeiture proceedings instituted by the state of Virginia for violations of laws enacted for the protection of oyster beds belonging to the state, have been libeled in this court for claims of material men and seamen, which constituted liens in admiralty upon the several vessels before their seizure by officers of the state.

Some of these claims will be allowed by this court, some of them disallowed; but the question in the case of each will remain, whether penal and forfeiture proceedings prosecuted by the state to a sale of a vessel arrested in delicto divests a lien in admiralty previously resting upon that vessel. Inasmuch as it is expressly enacted by section 2186 of the Code of Virginia that such sale "shall vest in the purchaser a clear and absolute title to the property sold," the question already stated takes the additional form whether that clause of the section is operative, or null and void, as to previously subsisting admiralty liens. These libels were not filed in either case during the pendency of the forfeiture proceedings prosecuted by the state. They were each of them brought after the final confiscation of the vessels, and after their coming into the hands of the purchasers. There was no actual conflict of jurisdiction between the court in which the criminal proceedings were had and the admiralty court. It was not until the confiscation of the vessels was finally consummated that suit in admiralty was instituted here to enforce the respective maritime liens; so that another form of the question which has been stated is whether an admiralty lien can be divested under proceedings, even criminal in character, by a common-law court.

The provisions of the Code authorizing the arrest and confiscation of vessels for violations of oyster laws are such as intentionally exclude all rights of innocent creditors of the vessels sold. The posting of a notice of the information filed for the forfeiture of the offending vessel on the front door of the courthouse at which the proceeding is conducted, and its publication in a newspaper of the state, such posting and publication, it is enacted, "shall be sufficient service of the notice on all persons concerned in interest." It is further enacted that "ignorance of the respondent or other contestant that the property seized was being used in violation of law shall be no defense. Nor shall it be ground of defense that the person by whom the said property was used in violating the law has not been convicted of such violation."

The sale of a ship by an admiralty court for the satisfaction of maritime liens, in due course of a suit in admiralty, gives the title to the purchaser against all the world. It gives such title by virtue of the maritime law, which is part of the law of nations. The provisions of the Code of Virginia as to the trial, the notice of trial, and the sale of a vessel arrested for violations of the oyster laws are intended, without the sanction of the maritime law, or of the law of nations, to make the sale of a vessel under the proceeding of the local court as

conclusive against the world as a sale in admiralty; so that the question already stated assumes the additional form whether the rights of maritime creditors in a ship can be divested by a local court by a proceeding unknown to the maritime law.

Let it be premised that it is declared by the constitution of the United States that "congress shall have power to constitute tribunals inferior to the supreme court;" that "the judicial power of the United States shall be vested in one supreme court, and in such inferior courts as congress may from time to time ordain and establish;" that "the judicial power shall extend to all cases of admiralty and maritime jurisdiction;" that "no state shall pass any law impairing the obligation of contracts;" and that "no person shall be deprived of property without due process of law." Let it be also premised that congress, in exercising its powers derived from the constitution, has provided that the district courts of the United States shall be courts of admiralty, and has, by the ninth section of the judiciary act of 1789, enacted that these courts "shall have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction."

The precedent principally relied upon by the respondents to the libels pending in this court is that of Taylor v. Carryl, 20 How. 583. In that case a creditor at large of the owners of the barque Royal Saxon, of Londonderry, Ireland, then lying in the port of Philadelphia, whose claim was not maritime, sued out a foreign attachment at Philadelphia, under which the ship was arrested and held to answer the judgment of the court of common law from which the attachment issued. While this suit was pending, the seamen on board the ship filed a libel for their wages in the admiralty court, sitting at Philadelphia, process under which was duly served by its marshal. While the suit at common law was still pending, the admiralty court pronounced a decree in favor of the libelants. Under this decree execution was issued, and the ship sold by the marshal, and delivered to the purchaser. Thereupon the plaintiffs in the common-law suit replevied the ship in the suit instituted in the common-law court. Under order of this court the sheriff sold the ship. These proceedings, thus briefly described, went to the supreme court of the United States for review, and that court held that in order to give jurisdiction to the admiralty court the arrest under its process must have been valid; and this was not the case when the vessel was, at the time of the seizure, in the actual and legal possession of the sheriff.

This case is far from being all fours with the one at bar, and decided nothing more than that a ship held in custody pending a litigation by one court is not liable to process of arrest by another court, even although the latter be a court of admiralty. This case of Taylor v. Carryl is, however, full of instruction for us in the one we have now under consideration. The supreme court was divided on the question of the competency of the admiralty court at Philadelphia to deal with the Royal Saxon while in custody of a common-law court. The majority held that it was not. The justices who dissented from this view were the admiralty judges, Taney, of Baltimore, Grier, of Philadelphia, Wayne, of Savannah, and Clifford, of Belfast, Me. As the dissenting opinion of Chief Justice Taney is a luminous

beacon in American jurisprudence, I will extract freely from it. He says, among other things:

"There are some principles of law which have been so long and so well established that it is sufficient to state them without referring to authorities. The lien of seamen for their wages is prior and paramount to all other claims on the vessel, and must be first paid.

"By the constitution and laws of the United States the only court that has jurisdiction over this lien, or is authorized to enforce it, is the admiralty court, and it is the duty of that court to do so. The seamen, as a matter of right, are entitled to the process of the court to enforce payment promptly, in order that they may not be left penniless and without the means of support on shore, and the right to this remedy is as well and firmly established as the right to the paramount lien. No court of common law can enforce or displace this lien. It has no jurisdiction over it, nor any right to obstruct or interfere with the lien or the remedy which is given to the seamen.

"A general creditor of the shipowner has no lien on the vessel. When she is attached by process from a court of common law, nothing is taken, or can be taken, but the interest of the owner remaining after the maritime liens are satisfied. The seizure does not reach them. The thing taken is not the whole interest in the ship, and the only interest which this process can seize is a secondary and subordinate interest, subject to the superior and paramount claims of the seamen's wages; and what will be the amount of those claims, or whether anything would remain to be attached, the court of common law cannot know until they are heard and decided upon in the court of admiralty. I do not understand these propositions to be disputed.

"Under the attachment, therefore, which issued from the common-law court of Pennsylvania, nothing was legally in the custody of the sheriff but the interest of the owner, whatever it might prove to be, after the liens were heard and adjudicated in the only court that could hear and determine them. * * * The question, then, is simply this: Can a court of common law, having jurisdiction of only a subordinate and inferior interest, shut the doors of justice for twelve months or more against the paramount and superior claims of seamen for wages due, and prevent them from seeking a remedy in the only court that can give it? I think not; * * * and it is equally a denial of the right of the court of admiralty to exercise the jurisdiction conferred on it by the constitution and laws of the United States.

"Now, it is very clear that, if this ship had been seized by process from a common-law court of the United States for a debt due from the owner, the possession of the marshal under that process would have been superseded by process from the admiralty upon a preferred maritime lien. This I understand to be admitted; and, if it be admitted, I do not see how the fact that this process was from a common-law court of a state, and served by its own officers, can make any difference; for the common-law court of a state has no more right to impede the admiralty in the exercise of its legitimate and exclusive powers than a common-law court of the United States.

"And the sheriff, who is the mere ministerial officer of the court of common law, can have no greater power or jurisdiction over the vessel than the court whose process he executes. He seizes what the court has a right to seize; he has no right of possession beyond it; and, if the interest over which the court has jurisdiction is secondary and subordinate to the interest over which the admiralty has exclusive jurisdiction, his possession is secondary and subordinate, in like manner, and subject to the process on the superior and paramount claim. It is the process and the authority of the court to issue it that must determine who has the superior right. * * * In the case of The Flora, 1 Hagg. Adm. 298, the vessel had been seized by a sheriff upon process from the court of king's bench. She was afterwards, and while in possession of the sheriff, arrested upon process from the admiralty on a prior maritime lien, and was sold by the marshal while the sheriff still held her under the common-law process. The sale by the marshal was held to be valid by the king's bench. * * * I cannot be persuaded that a court which, by the constitution of the marshal acted under a court of competent authority, (see note, p. 301;) and they refused to interfere with the surplus which remained after payment of

the seamen's wages, which had been paid into the registry of the admiralty, even in behalf of the creditor who had seized under their own process. * * * It was conceded on all hands that the possession of the sheriff was no obstacle to the arrest by the marshal.

"But it seems, however, to be supposed that the circumstance that the common-law court was the court of a state, and not of the United States, distinguishes this case from that of The Flora, and is decisive in this controversy. And it is said that the Royal Saxon was in the possession of another sovereignty, and in the custody of its law, and that no process could be served upon her, issuing from the court of a different sovereignty, without infringing upon the rights of the state, and bringing on unavoidably a conflict between the United States and the state. If by another and a different sovereignty it is meant that the power of the state is sovereign in its sphere of action, as marked out by the constitution of the United States, and that no court or officer of the United States can seize or interfere with property in the custody of an officer of a state court, where the property and all the right in it are subject to the control of the authorities of the state, nobody will dispute the proposition; but if it is intended to say that, in the administration of judicial power, the tribunals of the state and the United States are to be regarded as the tribunals of separate and independent sovereignties, dealing with each other in this respect upon the principles which govern the comity of nations, I cannot assent to it. The constitution of the United States is as much a part of the law of Pennsylvania as its own constitution; and the laws passed by congress pursuant to the constitution are as obligatory upon the courts of the state as upon those of the United States; and they are equally bound to respect and uphold the acts and process of the courts of the United States, when acting within the scope of their legitimate authority. * * *

"The constitution and laws which establish the admiralty courts and regulate their jurisdiction are a part of the supreme law of the state; and that state could not authorize its common-law courts to issue any process or its officers to execute it which would impede or prevent the admiralty court from performing the duties imposed upon it, in exercising the power conferred on it by the constitution and laws of the United States. The states have not, and cannot have, any jurisdiction in admiralty and maritime liens, to bring them into conflict with the courts of the United States.

"The constitution and laws of the United States confer the entire admiralty and maritime jurisdiction expressly upon the courts of the general government, and admiralty and maritime liens are therefore outside of the line which marks the authority of a common-law court of a state, and excluded from its jurisdiction: and if a common-law court sells the vessel to which the lien has attached, upon condemnation, to pay the debt, or on account of its perishable condition, it must sell subject to the maritime liens, and they will adhere to the vessel in the hands of the purchaser and of those claiming under him. * * * I cannot be persuaded that a court which, by the constitution of the United States, has no jurisdiction on the subject-matter—that is, the maritime lien—can, directly or indirectly, delay the court which, by the constitution, has exclusive jurisdiction, from fulfilling its judicial duty, or the seamen from pursuing their remedy where alone they can obtain it."

It does not appear whether the seamen, after the final conclusion of the common-law suit, brought their libel in admiralty to assert their lien against the purchaser of the Royal Saxon; but as the common-law suit, begun in 1847, did not end until 1858, it must be presumed that they had in the long interval been scattered by the winds to the four quarters of the earth.

It can hardly be pretended that the late Chief Justice Taney, who, for maintaining the supremacy of state laws in a matter within the proper sphere of state authority in a memorable case, was the best-abused judge that ever sat upon the bench, was capable of disparaging the authority of a state court in the case in which he delivered the opinion from which the foregoing extracts were made. The only

question in that case of Taylor v. Carryl, which was before the supreme court, was not whether the arrest and sale of the ship by the common-law court in a suit against the owner by a creditor at large could be ordered at all, but simply whether the admiralty could interpose to subject the ship to a maritime lien during the pendency of the common-law suit. Five of the justices held that the admiralty could not interpose; four of the justices dissenting from that ruling, and holding that the admiralty court could not be thus delayed in the exercise of its especial and exclusive powers.

The practice of the king's bench of England (a tribunal supposed by lawyers who have not kept pace with the progress of legal science in modern times to be especially hostile to the admiralty jurisdiction) is different from that established by the supreme court of the United States in Taylor v. Carryl. Not only in the case of The Flora, cited by Judge Taney, did it give way to the admiralty, but it is the practice of that court in like cases to do so. Nor are the other courts of England any longer influenced by the passionate invectives of Lord Coke against the admiralty. In the case of Harmer v. Bell, reported, in this country, in 22 Eng. Law & Eq. 62, we find a case, heard on appeal in privy council, similar in principle to the one at bar. I quote and condense from the syllabus:

"A Scotch steamer ran down an English vessel in the Humber. A suit was commenced by the owners of the English vessel against the owner of the steamer, in the court of session in Scotland, for damage, and the steamer was arrested under process of that court. Afterwards, and pending these proceedings, the steamer was sold by the Scotch court without notice to the purchaser of this unsatisfied claim against her. The proceedings in the court of session were still pending when the steamer, having come within the jurisdiction of England, was again arrested under process of the high court of admiralty in England, and an action for damages commenced in that court for the same cause of action as was still pending in Scotland. The owner of the steamer, who had purchased her, appeared under protest in the admiralty court, and pleaded—First, lis alibi pendens; and, secondly, that he was a purchaser for value without notice. Held, first, that the plea of lis alibi pendens was bad, as the suit in Scotland was in the first instance in personam, the suit being commenced by process against the persons of the owners of the vessel, (the defendants,) and the arrest only collateral to secure the debt, while the proceedings in the admiralty court in England were, in the first instance in rem, against the vessel, and therefore the two suits, being in their nature different, the pendency of one suit could not be pleaded in suspension of the other; secondly, that as by the civil law a maritime lien does not include or require possession, but, being the foundation of proceedings in rem, such lien travels with the thing into whosesoever possession it may come, and, when carried into effect by a proceeding in rem, relates back to the period when it first attached, the steamer was liable for the damages committed by her, though in the hands of a purchaser, without notice of the damage, or of the proceedings instituted against her." .

I think it is plain from what has been said that a maritime lien cannot be divested by any proceeding in a civil action in a common-law court; that such court cannot exercise jurisdiction over the lien either directly or indirectly; and that a state of this Union cannot under the constitution confer jurisdiction to divest this lien, the lien attaching at the moment of the contract or tort in which it originates, and traveling with the ship wherever it may go, into whosesoever possession it may come, by whatever right or accident. Nor can it

be adjudicated in the United States by any other court than those upon which, by the constitution and laws of the United States, the exclusive jurisdiction over it is conferred. The state of Alabama once passed a law by which she aimed to confer on certain state courts, as to certain maritime contracts, a jurisdiction over ships precisely the same as that possessed by the United States courts of admiralty; but the law became a nullity under the decision of the supreme court of the United States in the case of The Belfast, 7 Wall. 624, in which it was held that—

"In all cases where a maritime lien arises, the original jurisdiction to enforce it by a proceeding in rem is exclusive in the district courts of the United States, as provided by the ninth section of the judiciary act of 1789. State legislatures have no authority to create maritime liens; nor can they confer jurisdiction upon a state court to enforce such a lien by a suit or proceeding in rem as practiced in admiralty courts. The statute of 7th of October, 1864, of the state of Alabama, is therefore unconstitutional and void."

The admiralty jurisdiction under the law of nations is criminal as well as civil. The states in ceding, by the constitution, to the judicial power of the United States the cognizance of "all cases of admiralty and maritime jurisdiction," retained no part of the jurisdiction, either civil or criminal; and, when congress created certain courts as admiralty courts, the admiralty jurisdiction passed exhaustively to them, by virtue of the constitution, and it was unnecessary for congress to enact in express words, as it did, that this jurisdiction in civil causes should be exclusive. The jurisdiction in rem, belonging to admiralty courts,—that is to say, the power to deal with ships by name as sentient beings, irrespectively of ownership or other condition or circumstance,—belongs exclusively and peculiarly to the admiralty, and cannot be conferred, either for civil or criminal purposes, by state legislation, upon the common-law courts of a state, so as to operate in derogation or exclusion of the power of the admiralty to enforce maritime liens in due course of admiralty procedure.

In evasion of these settled principles of admiralty law, it avails nothing to contend that the police laws of a state are superior to them. Analogous in this respect to the law of Virginia providing for the seizure in rem and confiscation of vessels engaged in violating her oyster laws are the penal laws of congress enacted for the suppression of the slave trade and the unlawful catching of Africans on the Guinea coast. It was held by the supreme court that the sale of property forfeited under laws against the slave trade by proceedings in one of the circuit courts of the United States (which are common-law courts) did not affect the maritime liens of seamen and material men upon the property forfeited. In the case of The St. Jago de Cuba, 9 Wheat. 409, it was held that—

"The claims of seamen for wages, and of material men for supplies, where the parties were innocent of all knowledge of, or participation in, the illegal voyage, are preferred to the claim of forfeiture on the part of the government."

The court says in its opinion in that case:

"The precedence of forfeiture has never been carried further than to overreach common-law contracts entered into by the owner; and it would be un-

reasonable to extend them further." "Forfeiture does not ride over the rights derived under maritime contracts, whether they be called 'liens' or 'privileges.'" "In the case of wreckage and salvage, it is unquestionable that forfeitures would be superseded; and we see no ground on which to preclude any other maritime claim really and honestly acquired. We concur in the opinion of the court below that the fair claims of seamen and subsequent material men are not overreached by the previous forfeiture."

While this is so, yet it is undoubtedly true that the rights of seamen and all others on board of an offending vessel at the time of her arrest, and also the rights of the owner of the vessel, whether he be innocent of her offense or not, may be confiscated in due course of proceeding by the common-law courts of the states, as well as of the United States. U. S. v. The Malek Adhel, 2 How. 210.

The cases of Voorhees v. Bank, 10 Pet. 449; Foulke v. Zimmerman, 14 Wall. 113; McNitt v. Turner, 16 Wall. 365; McCready v. Virginia, 94 U. S. 391; and Boggs v. Com., 76 Va. 989,—are not in point. They would be in point if the regularity of the proceeding in the common-law court only was in question. Where a court of common law, having replete jurisdiction of a suit, has passed final decree or judgment, the regularity of its proceedings cannot be examined collaterally. But where their jurisdiction is confined within certain limits by the constitution of the United States, their jurisdiction may be examined collaterally, so far as they transcend the limits of their constitutional powers.

None will deny the competency of the state of Virginia to pass laws of forfeiture and confiscation effectual for the important purpose of protecting her oyster beds from piratical depredation. Such laws, as far as they can be operative, should be upheld and respected by the public and by the courts. The question here is not upon the policy of such laws, or upon the competency of the state to enact them, but simply whether, when enacted, they can be made to empower the common-law courts to exercise admiralty jurisdiction in prejudice of maritime liens; the states having, as the supreme court of the United States says in U. S. v. Bevans, 3 Wheat. 336, and in Jones v. League, 18 How. 76, "parted with the power so to legislate as to conflict with the admiralty jurisdiction or laws of the United States." Having parted with that power, the state of Virginia cannot exercise it to the divesting and destruction of maritime liens resting upon vessels seized and confiscated under her laws for the protection of oyster beds, where the seamen, material men, and others holding these liens are innocent of participation in the acts for which the vessels are confiscated.

It is urged by the attorney general of Virginia that the oyster fundum of the state, if liens arising anterior to confiscation were given precedence over forfeiture, would be destroyed, as vessels would go upon voyages of trespass "plastered all over with liens." But maritime liens are few, of definite character, and difficult to counterfeit. To be valid, they must be of recent origin; staleness destroys them. The court would stultify itself to admit the possibility of such abuses as this learned officer apprehends. Besides, it must be remembered that constitutional rights cannot be brushed away by mere suspicions of fraud. The admiralty court will always lean

towards the state in adjudicating these liens, and will rigidly scrutinize all such claims.

I come, therefore, to the examination of the claims of the libelants and petitioners in the three cases at bar. In the case of the schooner Elexena there are two claims of material men. That of S. F. Hastings for $36.63, for sails and repairs of sails, etc., is stale as to $23.63; only $13 is therefore allowed. That of Crockett & Connorton for $62.36, for supplies furnished within six months before the seizure of the vessel by the state of Virginia, is allowed. Decree will be entered for these sums. As to the claims of seamen filed in this case, amounting to $126.03, it appears from the imperfect papers presented in their behalf that they were on board of the Elexena at the time of her capture in delicto, presumably participating with the vessel in her violations of the laws of the state. These claims are therefore disallowed.

As to the case of the schooner Alice J. Venable. The claim of the libelant, J. T. Gibbons, is for sails and repairs of sails, furnished within six months before the seizure of the vessel, amounting to $68.59, which is allowed. That of Prendergast & Sons, for sails and other materials furnished within six months before the seizure of the vessel, amounting to $346.35, is allowed. As to the claims of seamen preferred in this case, amounting to $100.81, it is almost a necessary presumption, from the papers evidencing the claims, that the seamen were on board the offending vessel at the time of her seizure, and they are therefore disallowed.

In the case of the schooner Samuel T. White, the claim of the libelant for sails and tackle, amounting to $168, furnished within six months before seizure, is allowed. That of Ernest Parsons, amounting to $208.70, is disallowed in part and allowed in part. Items to the amount of $60.70 are disallowed as stale. Items to the amount of $13, for sails furnished after the seizure of the vessel, are disallowed, as not within the cognizance of the court. Of this claim the sum of $135 is allowed. Decree will be entered accordingly.