## STATE ex rel. OSAGE COUNTY SAVINGS & LOAN ASS'N v. WORTEN, Dist. Judge.

No. 24681.   Oct. 17, 1933.

Rehearing Denied Jan. 23, 1934.

Hamilton & Howard, Massingale, Duff & Manatt, Kleinschmidt & Johnson, William H. Martin, Albert H. Bell, Arden E. Ross, Yancey, Spillers & Brown, Hess Crossland, Orr & Rust, and Hunt & Eagleton, for plaintiff in error.

Conner & Conner and Claude Nowlin, for defendant in error:

ANDREWS, J.   This is an original proceeding in this court for a writ of mandamus by the Osage County Savings & Loan Association against Jesse J. Worten, judge of the district court of Osage county, state of Oklahoma.

It appears from the record that the plaintiff herein instituted an action in the district court of Osage county against Albert Holder and other persons for the recovery of a money judgment on a certain promissory note and for the foreclosure of a real estate mortgage given as security for the amount evidenced by that note; that summons was regularly served upon the defendants therein, notifying them to answer on or before the 17th day of February, 1933; that no answers were filed and no appearances made by any of those defendants; that on March 7, 1933, Senate Bill No. 76 of the Fourteenth Legislature (chapter 16, Session Laws of 1933) became effective; that on May 8, 1933, the plaintiff therein filed in the district court a written motion for judgment by default and offered to produce evidence in support of his petition, and that the defendant herein, the judge of the district court of Osage county, Okla., refused to hear said evidence and to render judgment by default on account of the act of the Legislature, supra.

There are many contentions made herein. However, it is necessary herein to decide only one question, which is whether or not the procedure provided by the legislative enactment, supra, is applicable to a proceeding pending at the time of the effective date thereof.

The action in the district court of Osage county was commenced by the filing of a petition and service of a valid summons, and that action was pending at the time of the effective date of the legislative enactment, supra.

The provisions of section 54, art. 5, of the Constitution are as follows:

"The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute."

That constitutional provision is in derogation of common law. In State ex rel. Atty. Gen. v. McCafferty, Co. Treas., 25 Okla. 2, 105 P. 992, this court said:

"To mitigate this harsh rule of the com-

mon law this general saving clause was preserved in our Constitution, and is a part of every act passed by our Legislature, as much so as if expressly written in the act. The part of it under discussion simply means that 'proceedings begun by virtue of such repealed statute,' instead of being dismissed by the court for want of jurisdiction after the repeal of that law, as under the common law, shall be by the court retained, and pass to judgment unaffected by the repealing act so far as the 'proceedings' are concerned; that is, the 'proceedings', which are defined to mean 'all the steps or measures adopted in the prosecution or defense of an action', shall not be affected, but, as stated, the court shall continue to entertain jurisdiction and proceed to judgment in the cause. John C. Gordon, Probate Judge, v. State of Kan. ex rel. Henry Boder, 4 Kan. 421; Main Street, etc., Co. of Horton v. Horton Hardware Co., 56 Kan. 448, 43 P. 769; Joseph L. Crawford v. David P. Shaft, 35 Kan. 478, 11 P. 334; Charles Jockers v. Mary Borgman, 29 Kan. 78, 44 Am. Rep. 625."

It will be noted that therein "proceedings" were defined as "all steps or measures adopted in the prosecution or defense of an action." In Harlow v. Board of Co. Com'rs of Payne County, 33 Okla. 353, 125 P. 449, the constitutional provision was applied to a pending proceeding. The decision of this court in that case was summarized in a decision of this court in Gayman, Co. Treas., v. Mullen, 58 Okla. 477, 161 P. 1055, in which it was said:

"In Black's Law Dictionary the word 'proceeding' is defined as follows:

" 'In a general sense, the form and manner of conducting judicial business before a court or judicial officer; **regular and orderly progress in form of law,**' etc. (The emphasis is ours.)

"And, although the question does not appear to have been heretofore discussed by this court, in the case of Harlow v. Board of Commissioners of Payne County, 33 Okla. 356, 125 P. 449, this court held that a proceeding to construct a bridge nearer than six miles to another bridge in contravention of the act of March 11, 1903 (Laws 1903, p. 246), as amended by the Act of March 10, 1905 (Laws 1905, p. 354, being section 7885, Comp. Laws 1909), in respect to the distance between bridges, being without authority and subject to be enjoined, was not legalized nor affected by the Act of February 17, 1911 (Laws of 1911, p. 41), repealing the provision of prior laws so contravened because of this provision of our Constitution. In that case a temporary injunction was granted to prevent the county commissioners from entering into and carrying out a contract of construction of a certain bridge over a river within six miles of another bridge upon the erroneous view that such bridges were farther apart; and from an order dissolving that injunction, before the Act of February 17, 1911, this case was brought to this court for review, where it was reversed upon the grounds that the distance between the bridges was less than six miles and the proposed bridge was within the inhibition of the prior statute, with the statement in the body of the opinion that the proceeding was not affected by the Act of February 17, 1911, repealing the inhibition because of the provision of the Constitution now under consideration."

The issue in Gayman, Co. Treas., v. Mullen, supra, was whether or not viewers had been properly appointed in a drainage proceeding. With reference thereto this court said:

"We think this change in the method and manner of selecting viewers, being in a mere matter of procedure and not in any matter of rights, does not affect the proceeding begun by virtue of the repealed statute in this respect, and that the report of the viewers appointed and acting under the old statute on the fourth day after the new statute went into effect was as valid as if there had been no change in the former statute."

In Green v. Board of Com'rs of Lincoln County, 126 Okla. 300, 259 P. 635, the record showed that the board of county commissioners, by resolution and notice, had caused an election to be called at which county bonds for road improvements were to be voted upon.

On the afternoon of the day on which the election was held, after most of the votes in question had been cast, the Governor approved an emergency measure passed by the Legislature which, in the language of this court, "amends or repeals the law under which the bonds are voted." This court held that the proceedings had been commenced prior to the enactment of the new statute and that the proceedings having been commenced under the law as it existed prior to the new statute, those proceedings were governed entirely by the law existing prior to the effective date of the new statute. That decision was based on the decision in Gayman, Co. Treas., v. Mullen, supra, and the decision of this court in Re Application of State to Issue Bonds, 40 Okla. 145, 136 P. 1104. In the latter case it was held:

"The omission of sections 372 to 381, Compiled Laws of 1909, from the Revised Laws of 1910, does not operate to abate a proceeding pending under said sections prior to the date when said Revised Laws of 1910 went into effect."

It was therein held that a proceeding to

fund outstanding indebtedness was a proceeding within the meaning of the constitutional provision. The court said:

"This proceeding being one begun prior to the date when the act of adoption went into effect, and being for the purpose of procuring an issue of bonds, it comes within the letter of the statute, as a proceeding begun and pending, as a necessary step in a bond issue authorized by the omitted act. The bond issue can only be saved by saving the proceeding provided for that purpose. It follows that the proceeding did not abate or become invalid by reason of the repeal of the statute under which it was begun prior to such repeal."

In Turk v. Mayberry, 32 Okla. 66, 121 P. 665, the issue was whether the Arkansas statute providing an exemption period of one year for redemption of real estate sold under execution was applicable after statehood. The case was filed on May 28, 1907. Judgment was rendered on June 30, 1907. It is evident that the change of law occurred while the proceeding was pending. This court held that the confirmation of sale prior to the expiration of the twelve months period was ineffective and void.

In Rolater v. Strain, 31 Okla. 58, 119 P. 992, the judgment had been rendered while the statute providing one year for appeal was in force, and after the judgment was rendered the provision for appeal was changed to provide for six months. The appeal was not perfected within six months from the date of judgment and a motion was filed in this court to dismiss the appeal. This court said:

"The same question which is presented here has been frequently presented in other states, and the almost uniform holding of the courts has been in accord with the conclusion to which we have come, and the rule may be stated generally to be that a statute reducing the time for taking an appeal does not apply to proceedings in which a judgment has been previously rendered, and that the right of appeal is governed by the provisions of law applicable thereto in force at the time when the judgment was rendered"

—and cited a number of decisions from that jurisdiction in support thereof. It held that the right of appeal was governed by the law applicable thereto in force when final judgment was rendered, and the constitutional provision therein referred to evidently was applied.

In his preface to his "Constitution and Enabling Act of Oklahoma", Mr. Justice Williams, formerly a member of the Constitutional Convention, while a justice of this court, said:

"Whilst we have been impressed that the many restrictions imposed upon the Legislature by matters of detail inserted in Constitutions are indicative of the people's distrust of their representatives, yet it is obvious that when such provisions are incorporated in a Constitution, the people understand that they then become fixed and unalterable except in the manner and form provided for its amendment. This is not an evidence that the people in their sovereign capacity desire to have the commonwealth other than a government of law, for, as a rule, a Constitution and its provisions are adopted after representatives have been especially elected and commissioned to frame its provisions, which are thereafter to be approved by the electors. When such organic law is ratified, though much of it is purely legislation, it is with the solemn realization that it then and there becomes a fixed organic law, subject to be changed only in the manner and form provided in the Constitution, and that the Legislature, by enactment, except where specially provided, the executive by administrative power, or the courts by construction, may not alter, modify or repeal same by the excessive use of power, though supported by public sentiment."

We call attention to the statement of that eminent authority for the reason that we do not think that this court should be swayed by public sentiment to alter, modify, or repeal any provision of the Constitution by the mere use of its power so to do. In the language of Mr. Justice Osborn, in Independent School Dist. No. 39, Creek County, v. Exchange National Co., 164 Okla. 176, 23 P. (2d) 210:

"We do not believe that our courts should base their decisions involving the fundamental rights of citizens on proprieties and exigencies of the occasion."

In the language of Mr. Justice Turner, in State ex rel. West, Atty. Gen., v. McCafferty, Co. Treas., supra, the constitutional provision is a part of every act passed by our Legislature as much so as if expressly written in the act. The attempt on the part of the Legislature to make the provisions of the act in question apply to a proceeding pending at the time of the effective date of that enactment was ineffective by reason of the constitutional provision, supra. The Legislature had no such authority. In so far as the legislative enactment, supra, purports to change the procedure in a proceeding pending at the time of the effective date thereof, it is ineffective, unconstitutional, and void.

It appears from the record that the trial

court refused to hear evidence and to render a judgment by reason of the provisions of the legislative enactment, supra. In so doing the trial court was in error.

The writ of mandamus is ordered to issue, directing the trial court to proceed with the cause in question without regard to the provisions of Senate Bill No. 76 of the Fourteenth Legislature, and to apply the law and follow the procedure existing at the time of the commencement of the action in that court.

RILEY, C. J., CULLISON, V. C. J., and BAYLESS, BUSBY, and WELCH, JJ., concur. SWINDALL, McNEILL, and OSBORN, JJ., dissent.

---

OSBORN, J. (dissenting). In dissenting from the majority opinion, I desire to express my views.

Let us take a brief glance at the act and note its purpose and effects as disclosed by its salient provisions. It purports to be aimed at a temporary situation, in that, by its express terms, it is to be in force for only a period of two years after its passage and approval. It does not purport to amend any existing law, nor to repeal the same, but is supplementary thereof. Its terms apply to actions heretofore and hereafter filed, thus attaching itself to contracts and obligations theretofore existing. It does not purport to take away the ultimate enforcement of any right existing under the terms of the contract of the parties, but retards the procedure of the courts, and gives legislative sanction to the various courts, on their own motion or on application of any interested party, to retard the existing procedure, in so far as same affects the right of foreclosure of real estate as security for the obligation sought to be enforced. It does not purport to deprive a creditor of his right, under the terms of his contract, to sue and recover a personal judgment for money, and to enforce the same by the ordinary processes of the law. It purports to vest in the courts power and discretion to postpone the rendition of judgments foreclosing mortgages, and under certain circumstances in the exercise of said discretion it gives to the court power to require certain conditions to be complied with as a concomitant of the exercise of said discretion, such as the payment of accruing interest and all taxes, the payment of a reasonable rental during the time said cause is continued under the provisions of said act, and the appointment of a receiver, except where the property constitutes a homestead, to preserve, rent and operate said property, and apply the receipts as the court may direct, and to prevent waste or wilful injury or destruction of the property.

The general social and economic conditions which pressed the legislative department of government to promulgate the policy embraced in the act under consideration are within the general knowledge of all. From the crest of an unprecedented wave of prosperity, superinduced by national and international extensions of credit to foreign nations and to their citizens, the people of this state and nation found themselves almost four years ago suddenly thrust into the trough of depression and deflation, likewise unprecedented, in that it became practically world-wide in its direful consequences. The financial structure of various nations almost completely collapsed to such an extent that the ancient media of exchange were abandoned, and this nation, contrary to a long tradition, suspended payment of obligations in gold. International obligations matured to our government from various nations and default occurred in payment thereof. In short, the economic basis of trade relations throughout the world became so unstable that foreign trade practically ceased. It is a matter of general knowledge also that an overwhelming percentage of farms and residences and buildings in the cities, towns, and villages of the state are mortgaged, and therefore thousands of our citizens could be classed as mortgagors of real estate. In a great percentage of such cases the mortgaged real estate constituted the family homestead. During the inflation period of 1918-1929, the burden of taxation had enormously increased. For four years the prices of farm commodities had been far below the cost of production. Industries, in which thousands of home owners had theretofore been employed, had curtailed, or wholly ceased, their operations, resulting in millions of unemployed workers, many of whom were owners of homes which had been mortgaged, and who, by the cessation of the operation of industry and trade, were unable not only to pay the high and exorbitant taxes upon their property, but also who were unable to procure the bare necessities of food for themselves and their families. Through no direct fault of their own, but largely by reason of the economic catastrophe, these owners of mortgaged real estate were unable to pay the interest charges on their mortgages. Default in the payment of taxes and interest was inevitable. Competitive bidding at foreclosure sales of real property virtually disappeared,

and. in countless instances, valuable property sold for a small percentage of the present cost of replacement thereof and wholly without regard to the annual income thereof, and for much less than the judgment indebtedness against the same, thereby leaving unsatisfied large deficiency judgments against the judgment debtors, many of whom were the owners of other real and personal property, which likewise, by reason of the economic conditions and financial chaos, was without utility as a basis of credit with which to procure funds to pay the delinquent taxes and interest or mortgage indebtedness already matured, which occasioned the foreclosure action.

In addition, thousands of banks, the arteries of our financial and credit system, in which were trustfully deposited the surplus moneys of the people, in many instances the savings of a lifetime, failed frequently, supplanting wealth and affluence with poverty and want, and taking away from thousands of depositors the ability to pay obligations, and the basis of credit to borrow money to discharge obligations.

The alleviation of the conditions above briefly outlined has been a matter of grave concern to the state and national governments. Millions of dollars have been expended by both the state and national governments, not only to provide honorable employment, but also in direct charitable donations. Billions of dollars of public funds have been loaned, through governmental instrumentalities, to various insurance companies, railroad companies, banking institutions, building and loan organizations and other public and quasi public corporations. We have witnessed unprecedented governmental actions, such as a national banking holiday, the granting and exercise of extraordinary powers by virtue of the National Emergency Banking Act and by the National Industrial Recovery Act, and we have seen vast and unprecedented powers delegated by Congress to the President of the United States to act for the public welfare in a calamitous peace-time emergency, which, in the language of the President of the United States himself, "has rocked the very foundation of our government."

This tremendous cataclysm was heroically met by many forbearing creditors by a kindly spirit of co-operation. To stay the hand of the unforbearing creditor, and to require him by law to yield his contractual rights for a limited time in favor of the distressed owner of mortgaged property in the interest of the general welfare of the citizens of the state, in view of the great economic emergency, the Legislature saw fit to declare the public policy as contained in said enactment.

It is contended by petitioners that said act contravenes section 10, art. 1, of the Constitution of the United States, in that it impairs the obligation of contracts, and the Fifth Amendment to the Constitution of the United States in that it deprives plaintiffs of property without due process of law, and takes private property for public use without just compensation, and the Fourteenth Amendment to the Constitution, prohibiting any state from depriving any person of life, liberty or property, without due process of law, or denying to any person within its jurisdiction equal protection of the laws. It is further contended that it violates section 15, art. 2, of the state Constitution, which provides in part as follows:

"No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed."

Whether the act impairs the obligation of contracts, takes property without due process of law, takes private property without just compensation, and is therefore void and ineffective, requires a consideration of other basic fundamentals of our form of government, superior to any limitation contained in any constitutional provision. The very foundation of the Constitution itself, on which our government rests, is recognized in the Preamble to the Constitution of the United States. Herein the founders solemnly proclaimed the supreme purpose to "promote the general welfare, and secure the blessings of liberty to ourselves and our posterity." The issue presented is whether or not such extreme emergency exists that the general welfare is so affected as to justify, under the inherent police power of the state, an enactment of law which temporarily suspends for a reasonable time certain rights of individuals in the interest of the general welfare and general prosperity. If such great emergency exists, and if in recognition thereof the Legislature has by said act not transcended its authority to act reasonably to promote the general welfare of the people, and if said act reasonably tends to promote the public peace, health, morals, safety, general welfare, and prosperity of the citizens of the state, the act in question must be held valid and effective.

In approaching a discussion of this momentous question, we are not unmindful, not only of a great contrariety of judicial opinion by the highest courts of the various states, but also of divergence of opinion among the Justices of the Supreme Court of the United States. To enter into a comprehensive academic discussion of the fundamental theories of our government as applied to legislation of the character under consideration would, we think, serve no useful purpose in reaching the ultimate correct result. We shall endeavor to confine our observations within the sign-posts placed along the way by eminent courts and eminent jurists who have heretofore been called upon as pioneers to blaze the trail of the ceaseless surge of civilization. The interpretations placed upon the various provisions of the Constitution of our nation, by the highest judicial tribunal, are solemnly binding upon this court, and whether or not we may abstractly differ in our views from those interpretations, a proper respect for constituted judicial authority compels and requires that we follow in the footsteps of that tribunal to whom has been delegated by the people the supreme right to lay out the path that shall be trod by generations yet to come.

Courts will never declare unconstitutional and void an act of legislation passed with all the forms and solemnities requisite to give it the force of law, unless the nullity and invalidity of the act are placed in its judgment beyond a reasonable doubt. It is only where the act is clearly, palpably and plainly inconsistent with the terms and provisions of the Constitution that the courts will interfere and declare such act invalid and void. All doubt, where there is doubt, will be resolved in favor of its constitutionality. City of Pond Creek v. Haskell, 21 Okla. 711, 97 P. 338; Monroe v. McNeill, 122 Okla. 297, 255 P. 150; State Board of Dental Examiners v. Pollock, 125 Okla. 170, 256 P. 927; Dies v. Bank of Commerce, 100 Okla. 205, 229 P. 474; Wallace v. Gassaway, 148 Okla. 265, 298 P. 867; McCullock v. Maryland, 4 Wheat. 316, 4 L. Ed. 579; Sweet v. Rechel, 159 U. S. 380, 40 L. Ed. 188, 16 Sup. Ct. 43.

Let us allude, therefore, to the expressions of the courts relating to acts of this character, and let us apply the fundamental principles gleaned therefrom to the act in question.

In the case of Atlantic Coast Line Ry. Co. v. City of Goldsboro, 58 L. Ed. 721 (decided February 24, 1914) the Supreme Court of the United States, speaking through Mr. Justice Pitney, said:

"For it is settled that neither the 'contract' clause nor the 'due process' clause has the effect of overriding the power of the state to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise. Slaughter House Cases, 16 Wall. 36, 62, 21 L. Ed. 394-404; Munn v. Illinois, 94 U. S. 113, 125, 24 L. Ed. 77, 84; Boston Beer Co. v. Massachusetts, 97 U. S. 25, 33, 24 L. Ed. 989, 992; Mugler v. Kansas, 123 U. S. 623, 665, 31 L. Ed. 205, 211, 8 Sup. Ct. Rep. 273; Crowley v. Christensen, 137 U. S. 86, 89, 34 L. Ed. 620, 621, 11 Sup. Ct. Rep. 13; New York & N. E. R. Co. v. Bristol, 151 U. S. 556, 567, 38 L. Ed. 269, 272, 14 Sup. Ct. Rep. 437; Texas & N. O. R. Co. v. Miller, 221 U. S. 408, 414, 55 L. Ed. 789, 795, 796, 31 Sup. Ct. Rep. 534. And the enforcement of uncompensated obedience to a regulation established under this power for the public health or safety is not an unconstitutional taking of property without compensation or without due process of law. Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226, 255, 41 L. Ed. 979, 991, 17 Sup. Ct. Rep. 581; New Orleans Gas-light Co. v. Drainage Commission, 197 U. S. 453, 462, 49 L. Ed. 831, 835, 25 Sup. Ct. Rep. 471; Chicago, B. & Q. R. Co. v. Illinois, 200 U. S. 561, 591, 592, 50 L. Ed. 596, 608, 609, 26 Sup. Ct. Rep. 341, 4 Ann. Cas. 1175.

"Of course, if it appear that the regulation under criticism is not in any way designed to promote the health, comfort, safety, or welfare of the community, or that the means employed have no real and substantial relation to the avowed or ostensible purpose, or that there is wanton or arbitrary interference with private rights, the question arises whether the law-making body has exceeded the legitimate bounds of the police power."

In the case of Block v. Hirsh, 65 L. Ed. 865 (decided April 18, 1921), the Supreme Court of the United States had under consideration an act passed by Congress relating to the renting of property in the District of Columbia, which act provided that a tenant occupying certain property, and after the expiration of the term of his contract, should be permitted to continue to occupy the same, notwithstanding the objection of the owner of said premises. so long as he paid rent theretofore fixed by his expired contract, and subject to regulation by a certain commission. Under the terms of the act it was to remain in force for two years. Said act contained a section setting forth that an emergency existed whereby

the public business was being hampered by the eviction of tenants. We quote portions of the opinion, announced by Mr. Justice Holmes, as follows:

"No doubt it is true that a legislative declaration of facts, that are material only as the ground for enacting a rule of law, for instance, that a certain use is a public one, may not be held conclusive by the courts. Shoemaker v. United States, 147 U. S. 282, 298, 37 L. Ed. 170, 184, 13 Sup. Ct. Rep. 361; Hairston v. Danville & W. R. Co., 208 U. S. 598, 606, 52 L. Ed. 637, 640, 28 Sup. Ct. Rep. 331, 13 Ann. Cas. 1008; Prentis v. Atlantic Coast Line Co., 211 U. S. 210, 227, 53 L. Ed. 150, 159, 29 Sup. Ct. Rep. 67; Producers Transp. Co. v. Railroad Commission, 251 U. S. 228, 230, 64 L. Ed. 239, 241, P. U. R., 1920C. 574, 40 Sup. Ct. Rep. 121. But a declaration by a legislature concerning public conditions that, by necessity and duty, it must know, is entitled at least to great respect. In this instance Congress stated a publicly notorious and almost world-wide fact. That the emergency declared by the statute did exist must be assumed, and the question is whether Congress was incompetent to meet it in the way which it has been met by most of the civilized countries of the world.

"The general proposition to be maintained is that circumstances have clothed the letting of buildings in the District of Columbia with a public interest so great as to justify regulation by law. Plainly, circumstances may so change in time or so differ in space as to clothe with such an interest what at other times or in other places would be a matter of purely private concern. It is enough to refer to the decisions as to insurance, in German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 58 L. Ed. 1011. L. R. A. 1915C. 1189. 34 Sup. Ct. Rep. 612; irrigation, in Clark v. Nash, 198 U. S. 361, 49 L. Ed. 1085, 25 Sup. Ct. Rep. 676, 4 Ann. Cas. 1171; and mining, in Strickley v. Highland Boy Gold Min. Co., 200 U. S. 527, 50 L. Ed. 581, 26 Sup. Ct. Rep. 301, 4 Ann. Cas. 1174. They sufficiently illustrate what hardly would be denied. They illustrate also that the use by the public generally of each specific thing affected cannot be made the test of public interest (Mt. Vernon-Woodberry Cotton Duck Co. v. Alabama Inter-State Power Co., 240 U. S. 30, 32, 60 L. Ed. 507, 511, 36 Sup. Ct. Rep. 234.), and that the public interest may extend to the use of land. They dispel the notion that what in its immediate aspect may be only a private transaction may not be raised by its class or character to a public affair. See also Noble State Bank v. Haskell. 219 U. S. 104, 110. 111. 55 L. Ed. 112. 116. 117. 32 L. R. A. (N. S.) 1062, 31 Sup. Ct. Rep. 186, Ann. Cas. 1912A, 487.

"* * * The main point against the law is that tenants are allowed to remain in possession at the same rent that they have been paying, unless modified by the commission established by the act, and that thus the use of the land and the right of the owner to do what he will with his own and to make what contracts he pleases are cut down. But if the public interest be established, the regulation of rates is one of the first forms in which it is asserted, and the validity of such regulation has been settled since Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77. It is said that a grain elevator may go out of business, whereas here the use is fastened upon the land. The power to go out of business, when it exists, is an illusory answer to gas companies and waterworks, but we need not stop at that. The regulation is put and justified only as a temporary measure. See Wilson v. New, 243 U. S. 332, 345, 346, 61 L. Ed. 755, 772, L. R. A. 1917E, 938, 37 Sup. Ct. Rep. 298, Ann. Cas. 1918A, 1024; Ft. Smith & W. R. Co. v. Mills, 25 U. S. 206, 64 L. Ed. 862, 40 Sup. Ct. Rep. 526. A limit in time to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change. * * *

"Assuming that the end in view otherwise justified the means adopted by Congress, we have no concern, of course, with the question whether those means were the wisest, whether they may not cost more than they come to, or will effect the result desired. It is enough that we are not warranted in saying that legislation that has been resorted to for the same purpose all over the world is futile, or has no reasonable relation to the relief sought. Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 569. 55 L. Ed. 328, 339, 31 Sup. Ct. Rep. 259."

It is to be noted that Chief Justice White and Justices McKenna, Van Devanter, and McReynolds dissented. and Mr. Justice McKenna wrote a very interesting and instructive dissenting opinion.

In the case of Marcus Brown Holding Co. v. Feldman, 65 L. Ed. 877 (decided April 18, 1921), the Supreme Court of the United States had under consideration certain statutes of New York similar to the District of Columbia rent laws, considered in the last above-cited case. In this case the term of the tenant had expired by contract, and the owner of the premises had rented the property to another tenant. The tenant refused to surrender possession and justified his action by the act of the Legislature of the state of New York, providing that for a period of two years no action should be maintainable to recover the possession of real property, except under certain conditions relating to the use of the property by the owner. A great public emergency was declared in the act as the basis for the passage thereof. Mr. Justice Holmes,

in delivering the opinion of the court, used the following language:

"The chief objections to these acts have been dealt with in Block v. Hirsh, supra. In the present case more emphasis is laid upon the impairment of the obligation of the contract of the lessees to surrender possession, and of the new lease, which was to have gone into effect upon October 1, last year. But contracts are made subject to this exercise of the power of the state when otherwise justified, as we have held this to be. Manigault v. Springs, 199 U. S. 473, 480, 50 L. Ed. 274, 278, 26 Sup. Ct. Rep. 127; Louisville & N. R. Co. v. Mottley, 219 U. S. 467, 482, 55 L. Ed. 297, 303, 34 L. R. A. (N. S.) 671, 31 Sup. Ct. Rep. 265; Chicago & A. R. Co. v. Tranbarger, 238 U. S. 67, 76, 77, 59 L. Ed. 1204, 1210, 1211, 35 Sup. Ct. Rep. 678; Union Dry Goods Co. v. Georgia Pub. Service Corp., 248 U. S. 372, 375, 63 L. Ed. 309, 311, 9 A. L. R. 1420, P. U. R. 1920C, 574, 39 S. Ct. 117; Producers' Transportation Co. v. Railroad Commission of California, 251 U. S. 228, 232, 40 Sup. Ct. Rep. 131, 64 L. Ed. 239."

It is noted that four of the Justices dissented therefrom.

The same legislative acts received consideration by the Court of Appeals of New York, in the case of People ex rel. Durham Realty Corp. v. La Fetra, 130 N. E. 601. The opinion of the court, by Mr. Justice Pound, presents a very able and exhaustive discussion of various questions. We quote therefrom as follows:

"The landlord is a purveyor of a commodity, the vendor of space in which to shelter one's self and family. He has heretofore been permitted to make his own terms with his tenants, but that consideration is not conclusive. Unquestionably some taking of private property for the benefit of a class of individuals is the result of the housing laws. The free choice of tenants; the unlimited right to bargain—these are property rights which may not be affected unless a public advantage over and beyond such rights justifies legislative interference, but 'an ulterior public advantage may justify a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use.' Noble State Bank v. Haskell, 219 U. S. 104, 110, 31 Sup. Ct. Rep. 186, 187, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487 [Id., 219, U. S. 575, 580, 31 S. Ct. 299, 55 L. Ed. 341]. While in theory it may be said that the building of houses is not a monopolistic privilege; that houses are not public utilities like railroads and that if the landlord turns one off another may take him in; that rents are fixed by economic rules and the market value is the reasonable value; that people often move from one city to another to secure better advantages; that no one is compelled to have a home in New York; that no crisis exists; that to call the legislation an exercise of the police power, when it is plainly a taking of private property for private use and without compensation, is a mere transfer of labels, which does not affect the nature of the legislation—yet the Legislature has found that in practice the state of demand and supply is at present abnormal: that no one builds because it is unprofitable to build; that those who own seek the uttermost farthing from those who choose to live in New York and pay for the privilege rather than go elsewhere; and that profiteering and oppression have become general. It is with this condition, and not with economic theory, that the state has to deal in the existing emergency. The distinction between the power of eminent domain and the police power is often fine. In the main it depends on whether the thing is destroyed or is taken over for the public use. If property rights are here invaded, in a degree, compensation therefor has been provided, and possession is to be regained when such compensation remains unpaid. What is taken is the right to use one's property oppressively, and it is the destruction of that right that is contemplated, and not the transfer thereof to the public use. The taking is therefore analogous to the abatement of a nuisance or to the establishment of building restrictions, and it is within the police power.

"Emergency laws in time of peace are uncommon but not unknown. Wholesale disaster, financial panic, the aftermath of war (Hamilton v. Kentucky Distilleries & W. Co., 251 U. S. 146, 161, 40 Sup. Ct. 106, 64 L. Ed. 194) earthquake, pestilence, famine, and fire, a combination of men or the force of circumstances may, as the alternative of confusion or chaos, demand the enactment of laws that would be thought arbitrary under normal conditions (Bowditch v. Boston, 101 U. S. 16, 18, 19, 25 L. Ed. 980; American Land Co. v. Zeiss, 219 U. S. 47, 31 Sup. Ct. Rep. 200, 55 L. Ed. 82). Although emergency cannot become the source of power, and although the Constitution cannot be suspended in any complication of peace or war (Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281), an emergency may afford a reason for putting forth a latent governmental power already enjoyed but not previously exercised. Thus it has been held that, although the relation between employer and employee is essentially private so far as the right to fix a standard of wages by agreement is concerned, Congress may establish a standard of wages for railroad employees to be in force for a reasonable time in an emergency to avert the calamity of a nation-wide strike. Wilson v. New, 243 U. S. 332, 348, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024; Ft. Smith & W. R. Co. v. Mills, 253 U. S. 206, 40 Sup. Ct. 526, 64 L. Ed. 862.

"Even in the absence of an emergency, the state may pass wholesome and proper laws to regulate the use of private property. Lincoln Trust Co. v. Williams Bldg. Corp., 229 N. Y. 313, 128 N. E. 209; St. Louis Poster Advertising Co. v. City of St. Louis, 249 U. S. 269, 39 Sup. Ct. 274, 63 L. Ed. 599. * * *

"The next question is whether such laws impair the obligation of contracts, as applied to existing leases and tenancies which contain an express or implied obligation to surrender possession at the expiration of the term, or as applied to a case where it is claimed that the parties had contracted or stipulated between themselves in dispossess proceedings that the warrant should be issued on October 1st. The provision of the Federal Constitution that no state shall pass any law impairing the obligation of contracts puts no limit on any lawful exercise of legitimate governmental power. Legal Tender Cases, 12 Wall. 457, 551, 20 L. Ed. 287. The rule alike for state and nation is that private contract rights must yield to the public welfare, when the latter is appropriately declared and defined and the two conflict. Manigault v. Springs, 199 U. S. 473, 480, 26 Sup. Ct. 127, 50 L. Ed. 274; Louisville and Nashville R. R. Co. v. Mottley, 219 U. S. 467, 486, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; Producers Transportation Co. v. R. R. Com., supra; Atlantic Coast Line R. R. Co. v. City of Goldsboro, 232 U. S. 548, 558, 34 Sup. Ct. 364, 58 L. Ed. 721; Union Dry Goods Co. v. Georgia P. S. Corp., 248 U. S. 372, 375, 39 Sup. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420. But if the law is 'arbitrary, unreasonable, and not designed to accomplish a legitimate public purpose' (Mutual Loan Co. v. Martell, 222 U. S. 225, 234, 32 Sup. Ct. 74, 56 L. Ed. 175, Ann. Cas. 1913B, 529), the courts will declare it invalid."

In Edgar A. Levy Leasing Co., Inc., v. Siegel. 258 U. S. 242, 42 Sup. Ct. 289, 66 L. Ed. 595, the Supreme Court of the United States had under consideration the New York emergency housing laws, considered in the last above cited case. In announcing the opinion of the court, Mr. Justice Clarke used the following language:

"In terms the acts involved are 'emergency' statutes, and designed as they were by the Legislature to promote the health, morality, comfort, and peace of the people of the state, they are obviously a resort to the police power to promote the public welfare. They are a consistent inter-related group of acts essential to accomplish their professed purposes.

"The warrant for this legislative resort to the police power was the conviction on the part of the state legislators that there existed in the larger cities of the state a social emergency, caused by an insufficient supply of dwelling houses and apartments, so grave that it constituted a serious menace to the health, morality, comfort, and even to the peace of a large part of the people of the state. That such an emergency, if it really existed, would sustain a resort, otherwise valid, to the police power for the purpose of dealing with it cannot be doubted, for, unless relieved, the public welfare would suffer in respects which constitute the primary and undisputed, as well as the most usual basis and justification, for exercise of that power. * * *

"Given a constitutional substantive statute, enacted to give effect to a constitutional purpose, the states have a wide discretion as to the remedies which may be deemed necessary to achieve such a result, and it is very clear that that discretion has not been exceeded in this instance by the state of New York."

See, also, Chastleton Corporation v. Sinclair, 264 U. S. 543, 44 Sup. Ct. 405, 68 L. Ed. 841.

In the case of Union Dry Goods Co. v. Georgia Public Service Corp., 248 U. S. 372, 63 L. Ed. 309, 39 Sup. Ct. Rep. 117, 9 A. L. R. 1420, the Supreme Court of the United States, speaking through Mr. Justice Clarke, said:

"That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court."

To the same substantial effect, see the following cases: Manigault v. Springs, 199 U. S. 473, 480, 50 L. Ed. 274, 278, 26 Sup. Ct. Rep. 127; Hudson County Water Co. v. McCarter, 209 U. S. 349, 357, 52 L. Ed. 828, 832, 28 Sup. Ct. Rep. 529, 14 Ann. Cas. 560; Louisville & N. R. Co. v. Mottley, 219 U. S. 467, 482, 55 L. Ed. 297, 303, 34 L. R. A. (N. S.) 671, 31 Sup. Ct. Rep. 265; Chicago B. & Q. R. Co. v. McGuire, 219 U. S. 567, 55 L. Ed. 338, 31 Sup. Ct. 259; Rail & River Coal Co. v. Yaple, 236 U. S. 338, 35 Sup. Ct. 359; Aetna Ins. Co. v. Chicago Great Western Ry. Co. (Iowa) 180 N. W. 649, 16 A. L. R. 249; Loring v. Commissioners of Public Works (Mass.) 163 N. E. 82; City of Pasadena v. Charleville (Cal.) 10 P. (2d) 745; City of Dayton v. City Ry. Co., 16 Fed. (2d) 401; Hartland Law v. Railroad Comm. (Cal.) 195 P. 423; Liles v. Creveling (Tenn.) 268 S. W. 625; Ex parte White (Tex. Cr.) 198 S. W. 583; Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct. 186. 32 L. R. A. (N. S.) 1062; and Bratberg v. Advance Rumley Thresher Co. (N. D.) 238 N. W. 552.

Following and conforming to the principles enunciated above by the highest court of the nation, this court, in the case of C., R. I. & P. Ry. Co. v. Taylor, 79 Okla. 142, 192 P. 349, announced the following syllabus:

"The police power of the state can neither be abrogated, bargained away, nor alienated, even by express grant, and all contracts and property rights are acquired subject to its fair exercise, and neither the contract clause nor the due process clause in the federal Constitution overrides the power of the state to establish necessary and reasonable regulations under its police power. * * *

"While no court has undertaken to specifically define the outlying boundary lines of that inherent power of the government to enact, within constitutional limitations, laws to promote the order, safety, health, morals, and general welfare of society, denominated, for want of a better name, the police power, of the state, it is firmly settled that such power is an attribute of sovereignty and exists without reservations in the Constitution."

In the case of Ex parte Tindall, 102 Okla. 192, 229 P. 125, this court, in the syllabus, said:

The police power is an attribute of sovereignty, inherent in every sovereign state, and not derived from any written Constitution, nor vested by grant of any superior power.

"The term 'police power' comprehends the power to make and enforce all wholesome and reasonable laws and regulations necessary to the maintenance, upbuilding, and advancement of the public weal, and protection of the public interests.

"It is plastic in its nature and will expand to meet the actual requirements of an advancing civilization and adjust itself to the necessities of moral, sanitary, economic, and political conditions.

"No principle in our system of government will limit the right of government to respond to public needs and protect the public welfare.

"The Fourteenth Amendment to the Constitution of the United States does not interfere with the proper exercise of the police power of the several states."

The fair import of the above decisions is, we believe, that if the state has properly exercised its police power in relation to the subject of legislation, no provision of the Constitution precludes the validity thereof if the enactment is reasonable in its terms and is reasonably adapted to meet the conditions calling forth this exercise of sovereign power.

We shall briefly consider, therefore, the nature and derivation of this power.

Every court of last resort has been called upon to consider this elusive attribute of sovereignty. It "is not granted by or derived from the federal Constitution, but exists independently of it, by reason of its never having been surrendered by the state to the general government; that among the powers of the state, not surrendered,—which power therefore remains with the state,—is the power to so regulate the relative rights and duties of all within its jurisdiction as to guard the public morals, the public safety, and the public health, as well as to promote the public convenience and the common good; and that it is with the state to devise the means to be employed to such end, taking care always that the means devised do not go beyond the necessities of the case, have some real or substantial relation to the objects to be accomplished, and are not inconsistent with its own Constitution or the Constitution of the United States." House v. Mays, 55 L. Ed. 213.

In the case of Chicago, B. & Q. R. Co. v. Illinois, 50 L. Ed. 596, it is said:

"We hold that the police power of a state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety. * * * (citing cases) And the validity of a police regulation whether established directly by the state or by some public body acting under its sanction, must depend upon the circumstances of each case and the character of the regulation, whether arbitrary or reasonable, and whether really designed to accomplish a legitimate public purpose. * * *

"If the means employed have no real, substantial relation to public objects which government may legally accomplish—if they are arbitrary or unreasonable, beyond the necessities of the case—the judiciary will disregard mere forms, and interfere for the protection of rights injuriously affected by such illegal action. The authority of the courts to interfere in such cases is beyond all doubt. * * * If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution."

"It may be, said in a general way that the police power extends to all the great public needs. Camfield v. U. S., 167 U. S. 518, 17 S. Ct. 865, 42 L. Ed. 260." Noble State Bank v. Haskell, 219 U. S. 104, 31 S. Ct. 186.

See, also, District of Columbia v. Brooke, 214 U. S. 138, 29 Sup. Ct. 560, 53 L. Ed. 941.

"It (the police power) is to the public what the law of necessity is to the individual." State v. Mountain Timber Co., 75 Wash. 581, 135 P. 645.

"It is known when and where it begins, but not when and where it terminates." Champer v. City of Greencastle, 138 Ind. 339, 35 N. E. 14, 24 L. R. A. 768, 46 Am. State Rep. 390.

"It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion, to be greatly and immediately necessary to the public welfare." Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct. Rep. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062.

"Incapability of definition, however, does not destroy the right of the public to safeguard property, insure the general health, protect the morals, preserve the peace, or compel the use of property consistent with surrounding conditions by the exercise of arbitrary power, and in disregard of the primary right of the individual. A subject when measured by other conditions may warrant its exercise; whereas, if the relative condition be lacking, the power will be denied. Its exercise in proper cases marks the growth and development of the law rather than, as some assert, a tyrannical assertion of governmental powers denied by our written Constitutions. Although the fundamental truths must from their very nature remain unchanged, the right of property is a legal right and not a natural right, and it must be measured always by reference to the rights of others and of the public. Neither an individual nor the public has the right to take the property of another and put it to a private use. But it would be manifestly destructive to the advancement or development of organized communities to put the public to the burden of rendering compensation to one, or to many, when the individual use is, or might be, a menace to the health, morals, or peace of the whole community." Bowes v. Aberdeen, 58 Wash. 542, 109 P. 369, 30 L. R. A. (N. S.) 709.

"The Constitution of the United States was framed on the theory that all power resides in the people, and in promulgating an instrument the people of the several states reserved to themselves all powers, except those expressly delegated to the federal Government by the Constitution. Among the powers so reserved to the people was that which has come to be known as the police power of the several states and it has been appropriately said that the police power is inherent in all government. It is, so to speak, a weapon for self-defense which must necessarily be possessed by all governments. It is that power by which the greatest good may be secured to the greatest number. From this principle has arisen the maxim 'salus populi suprema est lex'." Sterrett & Oberle Packing Co. v. City of Portland, 79 Ore. 260, 154 P. 410.

"Police power is power inherent in government to enact laws within the constitutional limits to promote order, safety, health, morals, and general welfare of society, and is elastic, stretching out to meet progress of age." State v. Lockey (N. C.) 152 S. E. 693.

From the above expressions of the various courts, it is noted that the police power reserved to the people of the various states is the very foundation on which our government and social system rest. It has been extended and widened in its scope as the problems of government, occasioned by the changing economic and social conditions, become more complex. We would not in any wise minimize the importance of holding fast to the well established and fundamental principles safeguarded by our national and state Constitutions; yet this attribute of sovereignty, this prerequisite of life to the state as an organized instrumentality of the people themselves, to promote their general welfare and insure their domestic tranquility, must not be so circumscribed as to prevent the attainment of the fundamental objects of society. The common weal, the general welfare, must ever, in times of stress and storm, be paramount to the private rights of the individual, when public necessity and public welfare require; but this paramount right of society must be reasonably asserted and exercised to the end that individual liberty of action shall be preserved to the citizen, whose rights, except for the great public necessity, are safeguarded to him by the Constitution.

The judiciary is prohibited from concerning itself or inquiring into the wisdom of legislation, for that question has been expressly committed to the legislative department of government. As was said in the case of Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 31 Sup. Ct. 259, 263, 55 L. Ed. 328:

"The scope of judicial inquiry in deciding the question of power is not to be confused with the scope of legislative consideration in dealing with a matter of policy."

In the case of People ex rel. Durham Realty Corp. v. La Fetra, supra, the court said:

"Whether or not a public emergency existed was a question of fact debated, and debatable, which addressed itself primarily to the Legislature. That it existed, promised not to be presently self-curative,

and called for action, appeared from public documents and from common knowledge and observation. If the lawmaking power on such evidence has determined the existence of the emergency and has, in the main, dealt with it in a manner permitted by the constitutional limitations on legislative powers, so far as the same affects the class of landlords now challenging the statutes, the legislation should be upheld."

In the case of Bryne v. Maryland Realty Co., 129 Md. 210, 98 A. 549, it is said:

"It does not follow that because a statute has been enacted for the ostensible purpose of guarding the safety, health, comfort, or promoting the general welfare, it must be accepted as a proper exercise of the police power of the state; nor can a statute which is, in fact, a proper exercise of such power, be declared void merely because it results in circumscribing limits of individual conduct to narrower bounds. Necessarily there are limits beyond which legislation cannot constitutionally go in depriving individuals of their natural rights and liberties. To determine where the rights of the individual end and those of the public begin, is a question which must be determined by the courts. The Constitution is the highest written law of the state. The courts must obey both the Constitution and the statutes, but, in case of conflict between the two, the Constitution must control, and the statute must give way. When there has been an attempt to exercise the police power of the state by the lawmaking department of the government, and the validity of such act is challenged as being an unreasonable invasion of private rights, the courts must, upon their own responsibility, determine whether in the particular case the constitutional limits have been passed."

In the case of Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 67 L. Ed. 322, 43 Sup. Ct. Rep. 158, 28 A. L. R. 1321, the United States Supreme Court, speaking through Justice Holmes, who announced for the court the decisions in the cases of Block v. Hirsh and Marcus Brown Holding Co. v. Feldman, supra, and who commented concerning those cases that "they went to the verge of the law", used the following language:

"Government could hardly go on if, to some extent, values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation, and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the Legislature, but it always is open to interested parties to contend that the Legislature has gone beyond its constitutional power.

"This is the case of a single private house. No doubt there is a public interest even in this, as there is in every purchase and sale and in all that happens within the commonwealth. Some existing rights may be modified even in such a case. * * * But usually in ordinary private affairs the public interest does not warrant much of this kind of interference. A source of damage to such a house is not a public nuisance, even if similar damage is inflicted on others in different places. The damage is not common or public * * * the extent of the public interest is shown by the statute to be limited, since the statute ordinarily does not apply to land when the surface is owned by the owner of the coal. Furthermore, it is not justified as a protection of personal safety. That could be provided for by notice. Indeed the very foundation of this bill is that the defendant gave timely notice of its intent to mine under the house. On the other hand, the extent of the taking is great. It purports to abolish what is recognized in Pennsylvania as an estate in land—a very valuable estate—and what is declared by the court below to be a contract hitherto binding the plaintiffs. If we were called upon to deal with the plaintiff's position alone, we should think it clear that the statute does not disclose a public interest sufficient to warrant so extensive a destruction of the defendant's constitutionally protected rights."

Keeping in mind the broad power reserved by the state as an incident of its sovereignty, and the limitations thereof as pronounced by the various courts, there remains for determination the question of whether or not said police power has been reasonably exercised for the general welfare of the people by the legislative department of government, and whether the act under consideration reasonably tends to ameliorate the ills sought to be remedied thereby. The inquiry of the courts is restricted to a determination of whether there is a reasonable relation to the purpose competent for the Legislature to effect, and whether it is in any view adapted to the ends intended. Otis v. Parker, 187 U. S. 606, 47 L. Ed. 323, 23 Sup. Ct. Rep. 168; Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 55 L. Ed. 328, 31 Sup. Ct. Rep. 259; People v. Griswold, 213 N. Y. 92, 106 N. E. 929; Noble State Bank v. Haskell, 219 U. S. 104, 55 L. Ed. 112; Atlantic Coast Line R. Co. v. Georgia, 234 U. S. 280, 58 L. Ed. 1312, 34 Sup. Ct. Rep. 829.

We shall indulge in no fanciful speculations as to a change in economic conditions in the future. But we may take cognizance of the fact that prices of basic farm commodities have trebled since the passage of this act. Unemployment in a considerable degree has been relieved. Industries are beginning to operate. It was not unreasonable for the Legislature to assume that with the lapse of a brief time, during which the creditors' rights would be stayed, the economic conditions would in some degree so change that many owners of mortgaged real estate would be relieved from their financial stress and strain, and that a temporary respite would result in the saving of the homes of many of the citizens. Faced with such an emergency, with the public general welfare committed into its keeping, we think the Legislature was authorized, under the police power inherent in the people of the state, to deal with such emergency, and that the act so passed appears reasonably to be designed to promote the general welfare, and the means employed have a real and substantial relation to the avowed and ostensible purpose of alleviating the conditions sought to be remedied, and to the public objects which government may legally accomplish, and are not arbitrary, unreasonable, or beyond the necessities of the situation, and that said act is reasonably adapted to the end intended, and that same is valid and effective, notwithstanding the fact that private contractual rights may be thereby incidentally limited.

It is our view, therefore, that said act in the main is not invalid by reason of conflict with the provisions of section 10, article 1, or the Fifth or Fourteenth Amendments to the Constitution of the United States, or section 15, art. 2, of the Constitution of the state of Oklahoma.

The conclusion to which we have come in this matter was reached by the Supreme Court of Minnesota in the very recent case of Blaisdell v. Home Building & Loan Association, 249 N. W. 334 (opinion filed June 7, 1933), and largely the same reasoning was followed by that court in its determination of said case. However, a contrary conclusion was reached by the Supreme Court of North Dakota in the case of State ex rel. Cleveringa v. Klein, 249 N. W. 118, which court discredits the theory announced by the Supreme Court of the United States and hereinabove set forth, that the police power of the state, under certain conditions, and exercised in certain circumstances, is superior to contract rights of individuals. The

opinion of said court is based upon a quoted constitutional provision of said state, which specifically provides that certain fields are excluded from legislative invasion.

We have also noted the recent case of Adams v. Spillyards, 61 S. W. (2d) 686 (opinion filed June 19, 1933), wherein the Supreme Court of Arkansas held that a statute having the ultimate effect of abolishing deficiency judgments in foreclosure actions of real estate mortgages, was unconstitutional in that it impaired the obligation of contracts. The decision of the court is not authoritative under the issues presented in this proceeding for the reason that the act of the Arkansas Legislature permanently and effectively deprived persons of substantial rights, instead of merely postponing, for a reasonable time, under certain conditions, the enforcement thereof as provided for by our act. Clearly the act under consideration in Arkansas was violative of the national and state Constitutions.

Our attention has also been called to the case of Life Insurance Co. of Virginia v. Sanders, 62 S. W. (2d) 348, recently decided by the Court of Civil Appeals of Texas, sitting at El Paso. The opinion in that case lays down the principle that the remedy existing at the time of the making of a contract is annexed to the contract as a part thereof, and that any law impairing said remedy impairs the obligation. This case is based upon the ancient case of Green v. Biddle, 8 Wheat. 17, 5 L. Ed. 547; Bronson v. Kinzie, 1 How. 311, 11 L. Ed. 143; McCracken v. Hayward, 2 How. 608, 11 L. Ed. 397; Edwards v. Kearzey, 96 U. S. 595, 24 L. Ed. 793; and Barnitz v. Beverly, 163 U. S. 121, 41 L. Ed. 93. All of these cases were decided by the Supreme Court of the United States many decades ago. While it is undoubtedly true that the lapse of time in no wise changes the eternal and fundamental principles, yet the efflux of time sometimes makes imperative a new application of those eternal principles to the new and changing conditions. Since the decisions above mentioned, the Supreme Court of the United States has itself modified and changed the holdings in those cases, and applied new lights to the new conditions confronted by the people of the nation, and has refused to apply the antiquated keys of the past to the portals of the future. Thus we shall follow in its footsteps, with confidence that reason and justice will light our pathway.

Moratory legislation is by no means new in the world, having been resorted to by

200

many nations in both ancient and modern times. Our nation, and the various states of the Union, have many times adverted to this public policy as a temporary measure to meet unusual conditions. The devices used have been as varied as the acts themselves, and judicial sanction thereof has likewise been wavering and uncertain. Without analyzing the various provisions of the acts, we shall briefly mention some of this legislation and the action of the courts thereon.

In 1841 an act was passed in Alabama allowing a two-year redemption period of all judicial sales, which was held by the state Supreme Court to be constitutional in the case of Iverson v. Shorter, 9 Ala. 713.

In 1808 in Georgia, an act was passed providing for the suspension of all executions and trials of actions except for rights in property until May 23, 1808, which act was held constitutional in the case of Grimball v. Ross; T. U. P. Charlt. (Ga.) 175.

In 1860, in Iowa, the Legislature provided for a nine months stay in actions for foreclosures of mortgages limited to January 1, 1861, which was held constitutional in the case of Holloway v. Sherman, 12 Iowa, 282.

In 1861, in Kentucky, an act was passed closing the courts for seven months except for the trial of criminal cases, which was declared constitutional in the case of Johnson v. Higgins, 3 Metc. 566.

In 1814, an act was passed in Louisiana providing that no actions should be commenced, and all actions should be suspended, and prohibiting judicial sales until May 1, 1815, which was held constitutional in the case of Johnson v. Duncan, 3 Mart. 380.

In 1858, in Minnesota, a legislative act providing for a twelve months' redemption period of foreclosed property was held constitutional in the case of Stone v. Bassett, 4 Minn. 298. In 1860 an act was passed allowing a three years' redemption period on foreclosed property which was declared constitutional in the case of Heyward v. Judd, 4 Minn. 483.

In 1840, in Mississippi, an act was passed providing that no judicial sale should be valid unless two-thirds of the appraised valuation was bid, which was declared constitutional in the case of Woods v. Buie, 6 Miss. 285.

In Pennsylvania, in 1842, an act was passed providing for a one-year stay of judicial sales of real property where less than two-thirds of the appraised value was bid, which was declared constitutional in the case of Chadwick v. Moore (Pa. 1844), 8 W. & S. 49.

In Virginia, in 1869, an act was passed providing that judicial sales of personal property were to be made on a credit of twelve months, which was declared constitutional in the case of Garland v. Brown, 23 Grat. 173.

In Wisconsin, in 1858, an act was passed allowing a six months' stay of proceedings of mortgage foreclosures and executions. Said act was held constitutional. Von Baumbach v. Bade, 9 Wis. 559; Starkweather v. Hawes, 10 Wis. 125.

Other legislative acts through the same period of time of a moratory nature which have been held unconstitutional are discussed in the following cases: Hudspeth & Co. v. Davis, 41 Ala. 389; Burt v. Williams, 24 Ark. 91; People ex rel. Thorne v. Hays, 4 Cal. 127; Bronson v. Kinzie (U. S. 1843), 1 How. 311; McCracken v. Hayward (U. S. 1844) 2 How. 608; Blair v. Williams, 4 Litt. 34; Lapsley v. Brashears, 4 Litt. 47. Coffman v. Bank of Kentucky, 40 Miss. 29; Baily v. Gentry, 1 Mo. 164; Jones v. Crittenden, 1 Car. L. Rep. 385; Barnes v. Barnes (N. C. 1861) 8 Jones, 366; Jacobs v. Smallwood, 63 N. C. 112; Johnson v. Winslow, 64 N. C. 27; Bunn v. Raiguel & Co. v. Gorgas, 41 Pa. 441; State v. Carew, 13 Rich. L. & E. 148; Luter v. Hunter, 30 Tex. 688; Jones v. McMahan, 30 Tex. 719; Earle v. Johnson, 31 Tex. 164; Daniels v. Tearney, 102 U. S. 415; Taylor v. Stearns (Va. 1868) 18 Grat. 244.

Many of the acts discussed in the above cases sought to abrogate entirely certain contractual rights, instead of temporarily postponing the assertion thereof for a limited and reasonable time. Several of said acts postponed enforcement an indefinite period of time, instead of a definite reasonable time, and for said reason judicial sanction thereof was refused.

Let us turn to the specific provisions of the act and construe it in the light of the principles above considered.

While the act, by its title, purports to be a procedural act, and is so determined and in part construed by the majority opinion as such, we cannot agree that it in fact is procedural. It is not amendatory of the previous general law, nor does it purport to repeal the same. It is to continue in force for a period of only two years. It was not the intention of the Legislature to change the established procedure; it intended only to give legislative sanction to the court to retard the processes of the law in order that

the owners of mortgaged property might have additional time in which to adjust themselves to the economic situation, or in which the economic and social system should have time to rehabilitate itself to conform to the necessities of the people. The act is an emergency act, supplementary to the general laws, designed, in the opinion of the Legislature, to meet the exigencies of the occasion which called it into being. Its advantages were to be granted only upon application of the owner of mortgaged property, or upon the court's own motion in the exercise of a sound judicial discretion in applying the provisions of the act to the causes of action in the contemplation of the Legislature which called forth the exercise of the police power of the state by that body. Being supplementary of, and not a substitute for, existing laws, the provisions of this act should be construed in connection with existing laws, and effect given to both as far as possible in order to effectuate the beneficent intent.

By the first paragraph of section 1, relating to actions pending at the time of the passage of the act, it is provided that defendants who have not filed an answer in the cause "shall not be held to answer therein until the expiration of nine months after the date of the service of summons upon the defendant who is the record owner of the real estate. * * * "Upon application, it is the duty of the court to give effect to this provision, and the court of its own motion may likewise extend this leniency, but in the absence of request therefor, no mandatory duty rests upon the court in this respect.

The second paragraph of section 1 relates to actions filed after the effective date of the act. By the provisions of section 217, O. S. 1931, the pleadings of defendant shall be filed within 20 days after the return day of the summons. The act provides that the defendants "shall not be held to answer therein until the expiration of nine months after the date of the service of summons upon the defendant who is the record owner of the property at the time of the filing of suit." Giving effect to both acts, it is our opinion that the answer day of the summons to be issued to the defendant or defendants is governed by section 217, supra, and the construction placed upon the first paragraph of said section hereinabove set out is applicable.

Our attention has been directed to paragraph 3 of section 1 of the act, which provides that "in all actions now pending * * * in which the answer of defendant has already been filed, no trial shall be had and

no court of this state shall render judgment therein until the expiration of nine months after the passage and approval of this act. * * *"

It is noted that this provision is unqualified and unlimited and purports to deprive the courts, under any circumstances or conditions, of authority to render a judgment in such class of cases even by consent of the parties, and notwithstanding all parties may be desirous of a speedy determination of the issues. There may be instances where delay would not benefit the owner of the property, but would be positively injurious. By the provisions of sections 1 and 10, of article 7, of the Constitution the district courts are invested with judicial power, which power is unalterable and indestructible and cannot be abrogated or abridged by statute. To take away the rights of the courts to exercise their constitutional jurisdiction might operate to defeat the general purposes of the act. Such legislative action, therefore, has no real substantial relation to the purpose sought to be accomplished, and is beyond the necessities of the situation sought to be remedied and is arbitrary and unreasonable, and therefore transcends the limits of the proper exercise of the police power of the state. It is our view, therefore, that said provision is invalid and ineffective. Moreover, it appears that under section 2 of said act, giving legislative sanction to the continuance of causes by the court, the rights of the litigants can be fully safeguarded in the exercise of a wise judicial discretion. Doubtless the courts will follow the spirit of the act, deemed advisable by reason of the emergency recognized by the legislative authority.

By the provisions of section 2 of said act, legislative sanction is given to the court, upon its own motion or upon application of the owner of said property, to grant a continuance of said cause in his discretion; and by section 3 the court is authorized to attach certain conditions to the granting of such continuance. The conditions enumerated in section 3 were placed therein primarily for the benefit of the mortgagee, and are not obligatory to the extent of constituting conditions precedent to the exercise of discretion by the court in continuing said cause. They are legislative signposts marking the way for the exercise of judicial discretion. We shall not indulge in the presumption that the courts will disregard these statutory provisions of the act.

It is contended that section 4 deprives the mortgagee of a valuable right in that it restricts the power of the court to appoint

a receiver. On the contrary, the power of the court to appoint a receiver is thereby enlarged, except in cases where the property constitutes a homestead. When the provisions of said act are invoked in a cause, legislative sanction is given to the court to appoint a receiver for the property to husband the property and its income, regardless of the value of the property, and apply the receipts therefrom as the court may direct, during the period of time the cause is stayed. This is a valuable right granted to the mortgagee not theretofore existing, and was wisely granted by the Legislature as a precaution against abuse of the spirit of the act. The granting of a receiver is not mandatory, but the court is invested with a judicial discretion, which is always subject to review for abuse. As to homesteads, the general provisions of the statutes relating to the appointment of receivers (secs. 773-781, O. S. 1931) are neither specifically repealed nor repealed by implication. The power of the court to grant receivers is not limited to the period after the expiration of nine months in which the defendant may answer, but it is the duty of the court to exercise a wise judicial discretion in administering and applying said act to the causes of action wherein the benefits thereof are invoked.

Summarizing, we point out that said act is effective for only a limited reasonable time; it does not diminish or decrease the duty of debtors coming within its terms to discharge in full measure the obligations voluntarily assumed by them; it does not defer, nor purport to defer, the maturity of said obligations, or any part thereof; it defers for a limited, definite time, reasonable in term, the remedies of the mortgagee for the enforcement of his obligation, which, in the judgment of the legislative body, was necessary and proper to meet a temporary emergency, far-reaching in its direful results, grave in its consequences, subversive of the general welfare, peace, happiness, health, prosperity, and convenience of the people of the state. In the exercise of the majesty and sovereignty of the state, it is our view that the act constitutes a proper exercise of the police power of the state, and, except as hereinabove pointed out, is valid and effective.

The questions above discussed constitute the main issues urged in the briefs and upon oral presentation of the group of causes involving the act in question.

We shall allude briefly to the majority opinion and the fundamental error therein.

The majority opinion is predicated upon the conclusion that the act is purely an act amending civil procedure for the foreclosure of real estate mortgages instead of an act passed by virtue of the police power of the state. It is based upon the premise that "the repeal of a statute shall not affect any proceedings begun by virtue of such repealed statute," as provided by section 54, article 5, of the Constitution. But the majority opinion studiously refrains from pointing out what act, if any, is repealed, either expressly or by implication. The act in question repeals, and purports to repeal, no prior act. Hence, there is no field of operation for the constitutional provision relied on.

In the companion case of State of Oklahoma ex rel. v. E. A. Waterfield, 167 Okla. 209, 29 P. [2d] 24, decided on this date in an opinion by Justice Busby, a portion of the act is upheld "if and when construed," as determined in said opinion. The Justice concedes that under the inherent police power of the state, the act is in part valid. By said opinion, the right of the Legislature to fix a time of nine months as a reasonable time in which the court might require a defendant to answer in a mortgage foreclosure case is stricken down, but the right of the court to grant a continuance and postponement of said action for two years is with expressed reluctance upheld. In other words, the Legislature could delegate to a subordinate agency a right which it, by its own act, could not exercise. We cannot agree to such an anomaly. The right of an instrumentality of sovereignty cannot be greater than sovereignty itself. The opinion is inconsistent within itself, and is in conflict with the opinion in the Worten Case. The principles recognized in the opinion are denied application.

The construction placed on said act as to the provisions held valid is not warranted by said act.

I am authorized to say that Justices SWINDALL and McNEILL concur herein.

---

Supplemental Opinion on Rehearing.

ANDREWS, J. In the petition for rehearing filed herein it is contended that this court has misconstrued the meaning of the provisions of section 54, article 5, of the Constitution, and that it has given to that section a construction different from that given to it in a number of former decisions of this court. In view of the fact that in a number of those cases this court held:

"No person has a vested right in any particular mode of procedure, and if, before the trial of the cause, a new law of procedure goes into effect, it governs, unless the statute itself provides otherwise"

—we deem it advisable to review the cases cited.

The quoted statement was made in Independent Cotton Oil Co. v. Beacham, 31 Okla. 384, 120 P. 969. The rule ·stated was the correct rule in that case, for therein the proceeding was not pending at the time the law was changed. That change in the law was the transition to statehood. Therein the court recognized the rule announced herein when it said:

"There is nothing in the Constitution or the Schedule.indicating a purpose to restrict the power of the state to change modes of procedure as to causes of action arising prior to the admission thereof, except as to actions that were pending at that time, unless it is section 1 of the Schedule to the Constitution * * *"

—by using the words, "except as to actions that were pending at that time." In that case the facts shown by the record were that an injury occurred prior to statehood and that the action to recover a money judgment for damages therefor was not commenced until after statehood. There is nothing in the record to show that there was any change in the procedure after that action was commenced. While the rule stated in that case was a correct one in that case, it is shown by that opinion that the rule was not intended to destroy the effect of the constitutional provision in question.

In American Nat. Ins. Co. v. Donahue et al., 54 Okla. 294, 153 P. 819, the record showed that the insurance policy sued on was issued on November 5, 1908; that the law was changed in 1909, and that the death occurred July 13, 1911. No proceeding was pending at the time of the changing of that law.

In Adams v. Iten Biscuit Co., 63 Okla. 52, 162 P. 938, the only petition shown by the record in this court was the amended petition which was filed on January 22, 1916. The change in the law shown by the record in that case was effective September 1, 1915. There was no change in the law after the proceeding was commenced.

In Shelby-Downard Asphalt Co. v. Enyart, 67 Okla. 237, 170 P. 708, an action was commenced in Osage county and dismissed for want of venue in that court. Thereafter the law was changed to fix the venue in such cases in that court. Thereafter a new action was instituted. The change of law was not made while the proceeding was pending.

In Fry et al. v. Wolfe, 106 Okla. 289, 234 P. 191, this court said:

"In these circumstances we think plaintiffs in error should be precluded from raising the question of procedure for the first time in the Supreme Court."

That quotation is a sufficient answer to the contention.

In Billy et al. v. Burnett, 137 Okla. 175, 278 P. 635, the record showed that the action was commenced May ' 20, 1927. The congressional act in question was the Act of Congress of April 12, 1926. Not only was that act effective prior to the commencement of the proceedings, but it specifically provided that it should not affect and that it might not be pleaded in any suit brought before the approval thereof.

The decision in Anderson v. Ritterbusch, Co. Treas., 22 Okla. 761, 98 P. 1002, is in no wise in point.

The provisions of section 54, article 5, supra, were not applicable in any of the cases cited in the petition for rehearing. The provisions of that section were not discussed in any of those cases. In no wise can they be construed to support the contention of the petitioner for rehearing.

The rule stated in the second paragraph of the syllabus of the decision in Independent Cotton Oil Co. v. Beacham, supra, was the rule at common law and is the general rule in this state. There are many exceptions thereto. One of them is that there may not be such a change in the procedure as to impair the obligations of contract. Oklahoma decisions to that effect are cited in Nelson v. Pitts, Co. Treas., 126 Okla. 191, 259 P. 533. Section 54, article 5, of the Constitution of Oklahoma provides another exception thereto. We do not think it necessary further to discuss the provisions of that section.

Herein it is contended that this court should disregard the constitutional provision in question in order that relief might be afforded to certain persons who are in distress. As a part of the argument in support of that contention it is said that the Legislature has attempted to afford such relief. The disregarding of a constitutional provision for the purpose of enabling distressed persons to be relieved is no more authorized than the disregarding of constitutional provisions for the purpose of imposing burdens upon distressed persons. If there was a power to do the one thing, that

204

power would authorize the doing of the other.

Constitutional provisions are not to be disregarded. We deem it necessary to go no further than to cite two statements from the farewell address of George Washington, President of the United States, on September 17, 1796. Therein he said:

"The basis of our political systems is the right of the people to make and to alter their Constitutions of government.—But the Constitution which at any time exists, until changed by an explicit and authentic act of the whole people, is sacredly obligatory upon all. The very idea of the power, and the right of the people to establish government, presuppose the duty of every individual to obey the established government."

And:

"It is important, likewise, that the habits of thinking in a free country should inspire caution in those intrusted with its administration, to confine themselves within their respective constitutional spheres, avoiding in the exercise of the powers of one department to encroach upon another. The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism. A just estimate of that love of power and proneness to abuse it which predominate in the human heart, is sufficient to satisfy us of the truth of this position. The necessity of reciprocal checks in the exercise of political power, by dividing and distributing it into different depositories, and constituting each the guardian of the public weal against invasions of the others, has been evinced by experiments ancient and modern: some of them in our country and under our own eyes. —To preserve them must be as necessary as to institute them. If, in the opinion of the people, the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the Constitution designates.—But let there be no change by usurpation; for though this, in one instance, may be the instrument of good, it is the customary weapon by which free governments are destroyed. The precedent must always greatly overbalance in permanent evil, any partial or transient benefit which the use can at any time yield." Washington's Farewell Address, Government Printing Office.

In the language of that eminent authority if there is a necessity for the legislation enacted by the Legislature, the people have within their control the power to so amend the Constitution as to permit valid legislation to that effect. Since the need arose for the legislation as enacted, there has been ample time for an amendment of the Constitution. Indeed, since the enactment of the legislative enactment in question, the Constitution has been amended in another respect by a vote of the people. We make this statement for the purpose of showing that the people are not without a remedy. That remedy is by an amendment of the Constitution which they created. That remedy is not by an appeal to the Legislature for the enactment of legislation in conflict with constitutional provisions, and it is not by appeal to this court to refuse to apply constitutional provisions. This court must and does realize that the precedent which would be established by its adoption of the theory contended for would greatly overbalance in permanent evil any partial or transient benefit which would be derived therefrom.

RILEY, C. J., CULLISON, V. C. J., and BAYLESS, BUSBY, and WELCH, JJ., concur. SWINDALL, McNEILL, and OSBORN, JJ., dissent.

---

SWINDALL, J. (dissenting). Owing to the fact that I am unable to harmonize the views expressed in the majority opinion in this case with the views expressed by the majority in the case of State ex rel. Roth, Trustee, v. Waterfield, Court Clerk, No. 24650. 167 Okla. 209, 28 P. (2d) 24, and in addition to the views expressed in the dissenting opinion of Mr. Justice Osborn, in which I concur, I feel it my duty to discuss certain issues which I do not feel are fully covered in the dissenting opinion delivered by Mr. Justice Osborn.

The first paragraph of the syllabus in this case declares the rule of law to be that:

"The provision of section 54, art. 5, of the Constitution of Oklahoma that the repeal of a statute shall not affect any proceedings begun by virtue of such repealed statute, applies whether the repeal be expressed or implied, the purpose of the provision being to require an action to pass to judgment under the law applicable thereto at the time of the institution of the action unaffected by any change in the law made after the institution of the action."

In the third paragraph of the syllabus the majority opinion holds that:

"In so far as Senate Bill No. 76 of the Fourteenth Legislature of Oklahoma, chapter 16, Session Laws of 1933, purports to change the procedure in a proceeding pending at the time of the effective date thereof it is ineffective, unconstitutional, and void."

It is nowhere pointed out in the majority opinion what section or sections of the Code of Civil Procedure is repealed by chapter 16, Session Laws 1933, or wherein said chapter changes a proceeding pending at the

time of the effective date thereof. The Legislature may provide for changes in procedure which affect only the remedy. Said chapter, by the terms thereof, is only a temporary act to be and remain in full force and effect for a period of two years from and after the date of its passage and approval, at the expiration of which time it shall become inoperative and void. In construing statutes the general rule is that the intent of the Legislature, when ascertained, must govern. McCarter v. State ex rel., 82 Okla. 78, 196 P. 303; Brown v. Miller, 89 Okla. 287, 215 P. 748; Board of Commissioners of Creek County v. Alexander, 58 Okla. 128, 159 P. 311; Sampson v. Clark, 2 Okla. 82, 35 P. 882. Any rule of statutory construction which defeats the legislative intent must be abandoned. Cherokee County Publishing Co. v. Cherokee County, 48 Okla. 722, 151 P. 187. In the construction of a statute it is the duty of the court to seek to ascertain and carry out the intention of the Legislature in its enactment and to give full effect to such intention. Town of Haskell v. Edmonds, 90 Okla. 44, 215 P. 629. The intention of the Legislature is the cardinal consideration in the construction of statutes, and whether a particular provision is mandatory or directory is to be determined from the language used and the purposes in view. City of Enid v. Champlin Refining Co., 112 Okla. 168, 240 P. 604. Among other things which may be considered in determining the intent of the lawmakers is the evil which it is designed to remedy; and, therefore, the court properly looks at contemporaneous events, the situation as it exists and as it was pressed upon the attention of the lawmakers. De Hasque v. Atchison, T. & S. F. Ry. Co., 68 Okla. 183, 173 P. 73. When the language of the statute is dubious, the court, in construing it, will consider the reason and intent of the law to discover its scope and true meaning. Grayson v. Thompson, 77 Okla. 77, 186 P. 236. Repeals by implication are not favored, and in construing separate enactments of the Legislature, that conclusion as to their intent must be reached, if possible, so as to give effect to each provision, and an earlier statute will not be held to be repealed by a later one by implication, unless the conflict between the two is irreconcilable. State ex rel. Power v. Wenner, County Treasurer, 121 Okla. 190, 249 P. 408; State ex rel. v. Taylor, 68 Okla. 38, 171 P. 452. The majority opinion in State ex rel. Roth, Trustee, v. Waterfield, County Clerk, supra, held section 1 of chapter 16, supra, to be unconstitutional and void. This is the only section of chapter 16

involved in State ex rel. Osage County Savings & Loan Association v. Worten, District Judge. Certainly the majority opinion does not intend to hold that an unconstitutional section in chapter 16 of the Session Laws of 1933 purports to change the procedure pending at the time of the effective date thereof or amend by implication any section of the Code of Civil Procedure.

Section 54 of article 5 of the Constitution does not apply to a mere change in procedure. In the case of Youst et al. v. Willis and Bradford, 5 Okla. 413, 49 P. 1014, this court said:

"This Legislature may provide for changes in the procedure of courts which affect only the remedy, and do not affect the obligation of any contract or the substantial rights of the parties."

In the case of Ensley v. State, 4 Okla. Cr. 49, 109 P. 250, the Criminal Court of Appeals held that section 54, article 5, does not apply to a change in the law of procedure merely. In the case of Independent Cotton Oil Co. v. Beacham, 31 Okla. 384, 120 P. 969, this court in the second paragraph of the syllabus announced the rule of law relative to procedure as follows:

"No person has a vested right in any particular mode of procedure, and if, before the trial of the cause, a new law of procedure goes into effect, it governs, unless the statute itself provides otherwise."

In the case of Shelby-Downard Asphalt Co. v. Enyart, 67 Okla. 237, 170 P. 708, the first paragraph of the syllabus reads:

"No one has a vested right in any particular mode of procedure for the enforcement or defense of his rights. Hence the general rule that statutes will be construed to be prospective only does not apply to statutes affecting procedure; but such statutes, unless the contrary intention is clearly expressed or implied, apply to all actions falling within their terms, whether the right of action existed before or accrued after the enactment."

The rule declared in the two cases just cited was approved by this court in the case of Coats et al. v. Riley et al., 154 Okla. 291, 7 P. (2d) 644.

The ninth paragraph of the syllabus in that case is:

"The general rule that a decision of a court construing a statute is prospective in operation only and does not affect a contract made pursuant to a former decision of the court, does not apply to a decision of a court construing a statute affecting procedure or a legal remedy, and a subsequent decision construing such a statute

applies retroactively as well as prospectively."

In the case of Monumental Brewing Co. v. Larrimore (Md.) 72 Atl. 596, the Court of Appeals of Maryland held that:

"A prayer to withdraw an action from the jury which makes no reference to the pleadings presents only the question whether the facts that might properly be found by the jury from the evidence constitute a good cause of action, and, if the prayer refers to the 'proceedings,' it does not by that term include the 'pleadings,' as the 'proceedings' consist of successive acts done and steps taken as parts of the suit during its progress, while the 'pleadings' consist of the statements of the litigants, in legal form, of facts constituting a cause of action and grounds of defense."

The court in that case quotes with approval from Strom v. Montana Cent. Ry. Co., 81 Minn. 346, 84 N. W. 46, wherein the Minnesota court held that:

" 'Proceedings,' in its most comprehensive sense, 'includes every step taken in a civil action except the pleadings'."

The Maryland court then continues in this language:

"Without adopting all of the views expressed in the cases to which we have referred, we think that the words 'pleadings' and 'proceedings' are not sufficiently alike in import to be interchangeably employed in instructions to juries. When it is desired in framing prayers to make special reference to the pleadings in the case, it should be done by referring to them as such."

In the case of People's Bank of Greenville v. Aetna Insurance Company, 53 Fed. 161, the Circuit Court of the United States for the District of South Carolina, considering certain sections of the Code of Civil Procedure of that state relative to pleading, says:

"The question, then, is, Within what time is the defendant required by the laws of the state of South Carolina, or by the rule of the state court, to answer a complaint? The answer to this question can not be found in decisions of courts sitting in other states. The act of Congress prescribes but one rule, the laws of the state in which the suit is brought, or the rule of the state court. We must find the solution of the question in the laws and the rule of the court of South Carolina. We can find it nowhere else.

"The Code of Procedure of South Carolina (section 164) provides: 'The only pleading on the part of the defendant is either a demurrer or an answer. It must be served within 20 days after the service of a copy of the complaint.'

"This rule is not inflexible. Section 195 of the same Code provides: 'The court may likewise, in its discretion, or upon such terms as may be just, allow an answer or reply to be made, or other act to be done, after the time limited by this Code of Procedure, or, by an order, enlarge such time.'

"So, also, section 405: 'The time within which any proceeding in an action must be had after its commencement, except the time within which an appeal must be taken, may be enlarged upon affidavit showing grounds therefor by a judge of the court.'

"Reading these sections as in pari materia together, it appears that, under the statute law of South Carolina, a defendant is required to answer or demur to the complaint within 20 days after service of a copy thereof upon him, unless the time has been enlarged by the court or a judge thereof."

Section 195, O. S. 1931, provides that:

"The pleadings are the written statements, by the parties, of the facts constituting their respective claims and defenses."

Section 197, O. S. 1931, provides that:

"The only pleadings allowed are: First: The petition by the plaintiff. Second: The answer or demurrer by the defendant. Third. The demurrer or reply by the plaintiff. Fourth. The demurrer by the defendant to the reply of the plaintiff."

Section 217, O. S. 1931, provides that:

"The answer or demurrer, by the defendant, shall be filed within 20 days after the day on which the summons is returnable; the reply or demurrer shall be filed within 30 days after the day on which the summons was made returnable; the demurrer to the reply filed within 40 days after the day on which the summons was made returnable."

Section 218, O. S. 1931, provides that:

"The court, or any judge thereof in vacation, may, in his discretion, and upon such terms as may be just, allow an answer or reply to be made, or other act to be done, after the time limited by this article, or by an order enlarge such time."

Section 259. O. S. 1931, provides that:

"A motion is an application for an order, addressed to the court, or a judge in vacation, or by any party to a suit or proceeding, or one interested therein, or affected thereby."

This brings us to a consideration of the intent of the Legislature in enacting chapter 16, Session Laws 1933. It is entitled, among other things, "An Act regulating procedure relating to the foreclosure of mortgages and other liens upon real estate," and is temporary in its nature, to remain

in force only for a period of two years, and in order to meet an economic condition existing in the state of Oklahoma. Prior to its enactment the procedure in force for foreclosing mortgage liens was that the answer or demurrer by the defendant shall be filed within 20 days after the day on which the summons is returnable, or at such time as the court or a judge thereof, in his discretion and upon such terms as may be just, allow an answer or reply to be made or other act to be done after the time limited by article 8, or the court or judge might enlarge such time. Under chapter 16 the Legislature, instead of granting discretion in the trial court to enlarge the time to answer on account of an economic condition, but in order to regulate the procedure so that the same might be uniform throughout the state during a period of depression, provided in the first clause in section 1 that the defendant or defendants shall not be held to answer therein until the expiration of nine months after the date of the service of summons upon the defendant who is the record owner of the real estate at the time of the filing of suit upon which the mortgage or other lien is sought to be foreclosed. As stated by Mr. Justice Osborn in his dissenting opinion, this portion of section 1 did not attempt to change the time for service and return of summons or the time in which the defendant or defendants were required to plead, that is, in the event the defendant or defendants should desire to file a motion to quash the summons or return thereon or to separately paragraph or number or make more definite and certain, or upon other grounds authorized by statute, or desired to demur to the petition of the plaintiff, the time of such defendant or defendants was not extended for such purpose, as section 1 does not provide that the time to demur or otherwise plead, except to answer, is extended, but clearly states that such defendant or defendants shall be held to answer, that is, that they shall not be required to answer, until the expiration of nine months after the date of the service of summons upon the defendant who is the record owner of the real estate at the time of the filing of the suit upon which the mortgage or other lien is sought to be foreclosed. We think this is a fair interpretation of the legislative intent. The Legislature knew that in certain districts of the state the district judges, exercising a sound judicial discretion, might upon a showing by the defendant or defendants, extend the time within which to answer for a longer period than a judge in another district

might feel inclined to do, and in order to temporarily regulate the procedure throughout the state and make the same uniform as to all parties, they enacted the chapter under consideration. If in doing so they did not act unreasonably or capriciously, we are not authorized as a court to declare the act unconstitutional. In the case of Suring State Bank v. Ernestine Giess et al., 246 N. W. 556, 85 A. L. R. 1477, the Supreme Court of Wisconsin held that:

"Where economic depression operates to prevent competitive bidding at a foreclosure sale, the court may, upon application for confirmation of a sale, determine upon a hearing the fair value of the property and give the holder of the mortgage a choice between crediting the value so determined on the foreclosure judgment and a resale.

"The court, in ordering a sale or resale of property on foreclosure during a period of economic depression operating to prevent competitive bidding, may, in its discretion and after a proper hearing, fix a minimum or upset price at which the premises must be bid in, if the sale is to be confirmed."

If, as held by the Supreme Court of Wisconsin, a court of equity in exercising a sound judicial discretion may, on account of an economic depression, upon application for confirmation of a sale, determine upon a hearing the fair value of the property and give the holder of the mortgage a choice between crediting the value so determined on the foreclosure judgment and a resale, then a court of equity, on account of an economic depression, might enlarge the time to answer, or if the Legislature felt that as a result of an economic situation such as has existed in Oklahoma for more than two years the granting of such time would promote the common good, then and under such circumstances, it had the right to enact such legislation in the exercise of the reasonable police power of the state. A court will never declare an act of the Legislature, passed with all the formality and solemnity required to give it the force of law, unconstitutional and void unless the nullity and invalidity of the act are placed, in its judgment, beyond a reasonable doubt. City of Pond Creek v. Haskell, 21 Okla. 711, 97 P. 338. In the case of State ex rel. Roth, Trustee, v. Waterfield. supra, the majority opinion in that case sustains all of chapter 16, Session Laws 1933, except section 1. as constitutional upon the ground that there exists in the state of Oklahoma an emergency calling for a reasonable exercise of the inherent police power of the state, and that the Legislature acted within the proper exercise of its powers in enact-

ing all of said act except section 1. Under the holding of the court, section 217, O. S. 1931, providing that the answer or demurrer shall be filed within 20 days after the day on which the summons is returnable, and section 218, O. S. 1931, authorizing the court or any judge thereof in vacation, in his discretion and upon such terms as may be just, to allow an answer or reply to be made or other act to be done after the time limited in section 217, supra, or by an order to enlarge such time, are still in full force and effect and not repealed by implication.

Section 54 of article 5 of our Constitution provides that, "The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute." It does not prohibit a change in "the procedure" in a pending proceeding, and this court has many times so held, and when this court inserts the words "the procedure" preceding the words "in a pending proceeding" in the third paragraph of the syllabus, it goes beyond the clear meaning and intent of the Constitution. Under the law as it existed at the time the action involved was commenced in the district court of Osage county, the district court or judge thereof was authorized to enlarge the time of the defendants to answer, and the act under consideration does not materially change any step in the proceedings.

I am of the opinion the only thing the act under consideration, except the 3rd paragraph of section 1, attempts to do is to put in force temporarily the inherent police power of the state, and such being clearly the legislative intent, we should so hold.

I am authorized to state that Mr. Justice McNEILL and Mr. Justice OSBORN concur in the views expressed herein.